James Jefferson McLAIN et al.

v.

**REAL ESTATE BOARD OF NEW ORLEANS, INC., et al.**

Civ. A. No. 75–3402.

United States District Court,
E. D. Louisiana.

May 31, 1977.

John P. Nelson, Jr., Ms. Patricia Saik, Nelson, Nelson & Lombard, Ltd., New Orleans, La., for plaintiffs.

Charles F. Barbera, for Stan Weber & Associates, Inc.

Arthur L. Ballin, for Real Estate Board of New Orleans, Inc.

Moise W. Dennery, J. W. Vaudry, Jr., for Latter & Blum, Inc.

Harry McCall, Jr., Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for Isabelle C. McLeod.

Roy L. Price, for Jefferson Board of Realtors, Inc.

Harry S. Redmon, Jr., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Gertrude Gardner, Inc.

Ms. Cynthia Samuel, for Sandra, Inc.

Edward F. Wegmann, for Waguespack, Pratt, Inc.

## MEMORANDUM OPINION AND ORDER

BOYLE, District Judge.

This intended class action was brought on behalf of buyers and sellers of residential property in the New Orleans area who have used the services of real estate brokers. Plaintiffs allege that the defendant associations and realtors have conspired to fix and control the price of these services in violation of the Sherman Anti-Trust Act (15 U.S.C. §§ 1 et seq.). They seek declaratory and injunctive relief as well as the recovery of treble damages.

■ A motion to dismiss the action was filed by defendants on the ground the challenged brokerage activities are wholly intrastate in nature and, since they neither occur in nor substantially affect interstate commerce, are beyond the ambit of federal anti-trust prohibition.[1] We took the matter under submission and now, having considered the memoranda of counsel and the relevant documents of record, we conclude defendants' motion must be granted and the action dismissed.

■ Plaintiffs raised several arguments in initially opposing the motion, but we found these groundless save for the contention that brokers in this area participate in securing the financing and insurance necessary to consummate the sale/purchase of real estate.[2] We reasoned that, to the extent the financing and insurance aspects of real estate transactions may be shown to be interstate in nature, defendants' practical nexus therewith might satisfy the jurisdictional requirement of the Sherman Act pursuant to the Supreme Court holding in Goldfarb v. Virginia State Bar. See 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). Accordingly, the parties were advised in conference that the issue at hand could be narrowed to the applicability of Goldfarb, and counsel were directed to engage in further discovery and submit additional memoranda addressed to this point. See Minute Entry of 9/3/76 [Record Doc. # 26].[3]

1. It is axiomatic that, in order for a federal action to be cognizable under the Sherman Act, the challenged activity must either be in interstate commerce or else have a substantial effect thereupon. See Battle v. Liberty National Life Insurance Co., 493 F.2d 39, 47 (5 Cir. 1974) and cases cited therein.

2. Plaintiffs had argued that many persons employing brokerage services are in the process of either moving into or out of the state, and that the alleged price-fixing activity by defendants is a per se Sherman Act violation which presumes that the jurisdictional requirement of the statute is satisfied. Yet, the mere interstate movement of a prospective buyer or seller—occurring either prior to or after the furnishing of brokerage services—hardly infuses such services with the requisite impact upon interstate commerce. Equally clear, in our view, is the fact that the per se rule of antitrust law relates solely to the merits of the claim and does not dispense with the threshold obligation of the claimant to establish subject matter jurisdiction.

3. Considering the results of this discovery and the supplemental briefs of counsel in addition to the pre-existing record, we reiterate the view that it is only via the Goldfarb analysis that this action may be said to arise under the Sherman Act. Thus rejected is argument by plaintiffs in their final memorandum that brokerage activities take place in interstate commerce by dint of a "national relocation service" in which two defendant realtors apparently participate. The service essentially involves an exchange of lists of brokers between realtors in different states. A participating realtor in one state will furnish to a client wishing to buy property in another the name of a broker therein who appears on the list, and receives a "referral fee" upon consummation of the sale by the out-of-state broker.

What plaintiffs fail to show in this approach is that the brokerage activity complained of herein occurs in or substantially affects interstate commerce. We do not construe their complaint to allege price-fixing with regard to broker referral fees, but only with regard to the fees which arise out of realtors' services in connection with the purchase or sale of real estate in the New Orleans area. We disregard the separate and independent participation of a

The *Goldfarb* case, like this one, involved allegations of price-fixing violative of the Sherman Act—there, through a minimum fee schedule prescribed by the defendant bar association and applied to legal services for title examinations relative to residential real estate transactions. The *Goldfarb* defendant likewise argued that since these legal services were performed intrastate and were essentially local in nature, they did not substantially affect interstate commerce within the meaning of the Sherman Anti-Trust Act. The Supreme Court disagreed, however, noting that the transactions which created the need for the legal services in question were themselves interstate in character. Not only did the purchases involve financing through a significant amount of out-of-state funds, but a significant number of the loans were guaranteed by out-of-state government agencies. The Court went on to find that

> [t]he necessary connection between the interstate transactions and . . . the minimum fee schedule is present because, in a practical sense, title examinations are necessary in real estate transactions to assure a lien on a valid title of the .borrower. . . . Thus a title examination is an integral part of an interstate transaction . . . . Given the substantial volume of commerce involved, *and the inseparability of this particular legal service from the interstate aspects of real estate transactions* we conclude that interstate commerce has been sufficiently affected.

[Emphasis added].

95 S.Ct. at 2011–12.

 It is clear that any inquiry based upon this decision must be twofold: 1) whether a "substantial" volume of inter-

state commerce is involved in the overall real estate transaction, and 2) whether the challenged activity is an essential, integral part of the transaction and inseparable from its interstate aspects. Yet in this case—even were it assumed *arguendo,* as plaintiffs purport to establish, that many title insurance companies issuing policies on local residential property are situated outside of Louisiana and, moreover, that the businesses providing the necessary financing in local real estate purchases extend across state lines—the second criterion of *Goldfarb* remains unsatisfied. Those real estate financing officials who were deposed consistently testified that, while brokers customarily contact mortgage companies to solicit financing information on behalf of clients and on occasion even transport clients to the company offices, the actual financing process involves only the lender and borrower and the brokerage service is in no way an integral aspect thereof. *See, e. g.,* Dep. of Edmond G. Miranne, at 23–26 [Record Doc. # 53]; Dep. of Julian O. Hecker, Jr., at 32, 36–37 [Record Doc. # 55]. Stan Weber, Chairman of the Board of one of the defendant companies, essentially corroborated this testimony, stating that brokers might be asked by purchasers about the best financing available, but "cannot assist someone to secure financing." *See* Dep. of Stan Weber, at 40 [Record Doc. # 61]. With regard to title insurance, it also appears through deposition testimony that the actual procurement process takes place between the insurer and lending institution/purchaser, the only contact between an insurer and broker being that the former does provide information concerning its services to various realtors. *See* Dep. of James W. Mills, Jr., generally and at 15–16, 18 [Record Doc. # 58].[4]

broker in referring clients to out-of-state sources, therefore, and focus upon the possible interstate commerce effects of the in-state transaction by which a broker regularly earns his commission.

4. In no way contradictory is the deposition testimony of two federal officials involved in the financing/insurance aspect of local real estate transactions. Angel Miranda, an area economist for the New Orleans office of the Department of Housing and Urban Develop-

ment (HUD), testified as to various programs operative in this area whereby his agency, as well as the Fair Housing Administration (FHA), make mortgage insurance available to homebuyers; but he made no reference to broker activity in this connection. *See* Dep. of Angel Miranda [Record Doc. # 52]. Another HUD official, Meaher Turner, gave further testimony concerning these loan insurance programs, but spoke of brokers only to the extent their services have been used by HUD in the sale of

Plaintiffs correctly observe that a broker's commission usually is earned only after the buyer has been successful in securing financing[5] and that, as a practical matter, title insurance is a precondition to execution of the loan. Nonetheless, the inescapable conclusion to be drawn from the evidence is that the participation of the broker in these (presumably interstate) phases of the real estate transaction is an incidental rather than indispensable occurrence in the transactional chain of events. We regard as still unrefuted the sworn statements of two brokers—filed in conjunction with defendants' motion—to the effect that the brokerage function is limited to bringing buyer and seller together and is essentially completed at that time. *See* Affidavits of Max Derbes, Jr. and Dalton L. Truax, Jr., att'd to Defendants' Motion [Record Doc. # 14].[6] Jurisdiction on the basis of *Goldfarb* is not established herein, and, in light of our ruling as to the other theories of interstate commerce involvement urged by plaintiffs, a cause of action under the Sherman Anti-Trust Act has not been stated.

For the foregoing reasons, defendants' motion to dismiss should be, and it is hereby, *GRANTED*, dismissing plaintiffs' action with costs.[7]

---

repossessed property. *See* Dep. of Meaher P. Turner [Record Doc. # 59].

Moreover, counsel for both sides cite in their memoranda the deposition of Paul Greiner, a loan guaranty officer for the Veterans Administration (VA). The transcript of this particular testimony nowhere appears in the record. But it nevertheless is worth noting that the memorandum of plaintiffs' counsel confirms what defendants represent to have been Greiner's testimony, i. e., that real estate brokers play no role in the actual process during which the VA decides whether to guarantee a loan. *See* Plaintiffs' Supp. Memo in Opposition to Motion, at p. 11 [Record Doc. # 56]; Defendants' Third Supp. Memo in Support of Motion, at p. 7 [Record Doc. # 57].

5. An apparent discrepancy exists between this statement and that of affiant-brokers Max Derbes, Jr. and Dalton L. Truax, Jr. to the effect that brokers "earn their commissions upon procuring a purchaser or seller. . . ." *See* Affidavits of Max Derbes, Jr. and Dalton L. Truax, Jr., att'd to Defendants' Motion [Record Doc. # 14]. Regardless of the exact point in time at which the commission accrues, however, the critical inquiry remains whether the service for which a broker earns his commission entails the financing and/or insurance of the transaction.

6. In deposition testimony, Derbes clarified this reference to the brokerage function being "essentially" completed at the time a purchaser or seller is procured. In "many cases," he declared, the broker has done all he must do at this stage, although in some instances his continued assistance might be needed to "make sure everybody is performing the conditions of the contract." *See* Dep. of Max Derbes, Jr., at 58. As far as involvement in financing is concerned, however, Derbes emphatically denied that under the standard form agreement to purchase or sell a broker acquires the authority to obtain financing on behalf of his client. *See id.*, at 60–62.

7. To the extent matters beyond the pleadings have been called to the court's attention, the motion, albeit styled a motion to dismiss for failure to state a claim, may be treated as one for summary judgment. See Rule 12(b), F.R. Civ.Pro. In fact, the motion also might properly be viewed as one for dismissal for lack of subject matter jurisdiction. In any event, no genuine issue of material fact appears to preclude judgment in defendants' favor pursuant to Rule 56.