McLAIN ET AL. *v.* REAL ESTATE BOARD OF NEW ORLEANS, INC., ET AL.

No. 78–1501.   Argued November 6, 1979—Decided January 8, 1980

BURGER, C. J., delivered the opinion of the Court, in which all other Members joined, except MARSHALL, J., who took no part in the consideration or decision of the case.

*Richard G. Vinet* argued the cause for petitioners. With him on the brief was *John P. Nelson, Jr.*

*Harry McCall, Jr.,* argued the cause for respondents. With him on the brief for respondents Real Estate Board of New

Orleans et al. were *Arthur L. Ballin, Frank C. Dudenhefer, Edward F. Wegmann, Harry S. Redmon, Jr., Rutledge Clement, Jr., Charles F. Barbera, Moise S. Steeg, Jr.,* and *William D. North. Edward F. Schiff, Paul B. Hewitt,* and *Moise W. Dennery* filed a brief for respondent Latter & Blum, Inc.

*Deputy Solicitor General Easterbrook* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General McCree, Assistant Attorney General Shenefield, John J. Powers III,* and *Margaret G. Halpern.**

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question in this case is whether the Sherman Act extends to an agreement among real estate brokers in a market area to conform to a fixed rate of brokerage commissions on sales of residential property.

## I

The complaint in this private antitrust action, filed in the Eastern District of Louisiana in 1975, alleges that real estate brokers in the Greater New Orleans area have engaged in a price-fixing conspiracy in violation of § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U. S. C. § 1. No trial has as yet been had on the merits of the claims since the complaint was dismissed for failure to establish the interstate commerce component of Sherman Act jurisdiction.

The complaint asserts a claim individually and on behalf of that class of persons who employed the services of a respondent real estate broker in the purchase or sale of

---

*\*William D. North* and *Valentine A. Weber, Jr.,* filed a brief for the National Association of Realtors as *amicus curiae* urging affirmance.

*Ellen Broadman* and *Alan Mark Silbergeld* filed a brief for Consumers Union of United States, Inc., as *amicus curiae.*

residential property in the Louisiana parishes of Jefferson or Orleans (the Greater New Orleans area) during the four years preceding the filing of the complaint. The respondents are two real estate trade associations, six named real estate firms, and that class of real estate brokers who at some time during the period covered by the complaint transacted realty brokerage business in the Greater New Orleans area and charged a brokerage fee for their services. The unlawful conduct alleged is a continuing combination and conspiracy among the respondents to fix, control, raise, and stabilize prices for the purchase and sale of residential real estate by the systematic use of fixed commission rates, widespread fee splitting, suppression of market information useful to buyers and sellers, and other allegedly anticompetitive practices. The complaint asserts that respondents' conduct has injured petitioners in their business or property because the fees and commissions charged for brokerage services have been maintained at an artificially high and noncompetitive level, with the effect that the prices of residential properties have been artificially raised. The complaint seeks treble damages and injunctive relief as authorized by §§ 4 and 16 of the Clayton Act, 38 Stat. 731, 737, as amended, 15 U. S. C. §§ 15, 26.

The allegations of the complaint pertinent to establishing federal jurisdiction are:

(1) that the activities of the respondents are "within the flow of interstate commerce and have an effect upon that commerce";

(2) that the services of respondents were employed in connection with the purchase and sale of real estate by "persons moving into and out of the Greater New Orleans area";

(3) that respondents "assist their clients in securing financing and insurance involved with the purchase of real estate in the Greater New Orleans area," which "financing and insurance are obtained from sources outside the State of Louisiana and move in interstate commerce into the State of Louisiana through the activities of the [respondents]"; and

(4) that respondents have engaged in an unlawful restraint of "interstate trade and commerce in the offering for sale and sale of real estate brokering services."

Respondents moved in the District Court to dismiss the complaint for failure to state a claim within the ambit of the Sherman Act. This motion was supported by a memorandum and by the affidavits of two officers of respondent Real Estate Board of New Orleans. The affiants testified that real estate brokers in Louisiana were licensed to perform their function in that State only, that there was no legal or other requirement that real estate brokers be employed in connection with the purchase or sale of real estate within Louisiana, and that the affiants had personal knowledge of such transactions occurring without the assistance of brokers. The function of real estate brokers was described as essentially completed when buyer and seller had been brought together on agreeable terms. The affiants also stated that real estate brokers did not obtain and were not instrumental in obtaining financing of credit sales, save in a few special cases, nor were they involved with examination of titles in connection with the sale of real estate or the financing of such sales.

The memorandum in support of the motion to dismiss sought to distinguish this case from *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773 (1975), in which we held that § 1 of the Sherman Act had been violated by conformance with a bar association's minimum-fee schedule that established fees for title examination services performed by attorneys in connection with the financing of real estate purchases. The respondents construed the applicability of *Goldfarb* as limited by certain language in the opinion that described the activities of lawyers in the examination of titles as an inseparable and integral part of the interstate commerce in real estate financing. 421 U. S., at 784–785. In contrast, with respect to this case, respondents asserted on the basis of the affidavits that "the role of . . . real estate brokers in financing such purchases is neither integral nor inseparable." Respondents

contended (1) that the activities of respondent real estate brokers were purely local in nature; (2) that the allegation that respondents assisted in securing financing or insurance in connection with the purchase of real estate had been controverted by the affidavits; and (3) that the conclusory assertion in the complaint that respondents' activities "are within the flow of interstate commerce and have an effect upon that commerce" was insufficient by itself to establish federal jurisdiction.

Petitioners' response to the motion to dismiss asserted that since adequate pretrial discovery up to that time had been precluded pursuant to a pretrial order, petitioners had not had a full opportunity to substantiate the jurisdictional allegations of their complaint. Petitioners advanced two independent theories to support federal jurisdiction: (1) that respondents' activities occurred within the stream of interstate commerce; and (2) that even if respondents' activities were wholly local in character they depended upon and affected the interstate flow of both services and people.

Accompanying the response was an affidavit stating that one of the named petitioners had employed the services of a respondent real estate broker to assist in an interstate relocation. There was also an affidavit from a loan guarantee officer of the Veterans' Administration disclosing that VA-insured loans for residential purchases in the Greater New Orleans area for the years 1973–1975 amounted to $46.3 million, $45.9 million, and $53.5 million, respectively.

After briefing on the jurisdictional issue, the District Court heard oral argument and received postargument briefs. The court then held a conference with counsel, the substance of which was carefully recorded in the minute entries by the District Judge:

"The Court advised counsel that it appears plaintiffs may satisfy said jurisdictional requirement only by bringing the facts of this case within the parameters of the

Supreme Court's holding in *Goldfarb v. Virginia State Bar*. . . . It is recognized, however, that further discovery is needed on the issue of *Goldfarb's* applicability *sub judice*. More specifically, such discovery should determine whether, in the first place, there is the requisite interdependence between the brokerage activity of defendants and the financing and/or insuring of real estate transactions in the New Orleans area and, secondly, whether there is a substantial involvement of interstate commerce in such real estate transactions *via* the financing and/or insurance aspects thereof."

Following this conference, petitioners deposed nine witnesses, who produced various documents. The deponents included government officials, real estate brokers, mortgage lenders, and real estate title insurers. This evidence was directed to establishing that an appreciable amount of interstate commerce was involved in various aspects of the purchase and sale of residential property in the Greater New Orleans area.

The deposition testimony of the president of Security Homestead Association, one of nearly 40 savings and loan institutions in the Greater New Orleans area, revealed that during the period covered by the complaint the Association lent in excess of $100 million for local purchases of residential property. The Association obtained loan capital from deposits by investors, some of whom lived out of state, and from borrowings from the Federal Home Loan Bank of Little Rock, Ark. Toward the close of the relevant period, the Association entered the interstate secondary mortgage market, in which existing mortgages were sold to raise new capital for future loans.

Another deponent was the president of Carruth Mortgage Corp., an Arkansas corporation doing business in Louisiana, Mississippi, and Texas. Its business was to originate home loans, then to sell the financial paper in the secondary mortgage market. The testimony showed that during the

relevant period Carruth made in excess of $100 million in loans on residential real estate in the Greater New Orleans area. The overwhelming proportion of these home loans was guaranteed by either the Federal Housing Administration or the Veterans' Administration. With respect to the FHA-guaranteed loans, Carruth collected and remitted premiums for the guarantee to the FHA in Washington, D. C., on a periodic basis for each account.

Both deponents testified that real estate brokers often play a role in securing financing information on behalf of a borrower and in bringing borrower and lender together, but that after the introductory phases the substance of the mortgage transaction progressed without the involvement of a real estate broker. The president of Carruth testified that his company required title insurance on all the home loans it made. This testimony was accompanied by the deposition of the president of Lawyers Title Insurance Co. of Louisiana, which revealed that each of the nearly 30 title insurance companies then writing coverage in the Greater New Orleans area was a subsidiary or branch of a corporation in another state.

Following the close of the discovery period and the filing of additional briefs, the District Court took the matter under submission and, having considered the memoranda of counsel and the relevant documents of record, issued a memorandum opinion and order granting the motion to dismiss the complaint. 432 F. Supp. 982 (1977). The court stated that the ground upon which respondents had challenged jurisdiction was that "brokerage activities are wholly intrastate in nature and, since they neither occur in nor substantially affect interstate commerce, are beyond the ambit of federal anti-trust prohibition." *Id.*, at 983. In line with the view expressed at the earlier conference, see *supra*, at 237–238, the District Court viewed the jurisdictional inquiry as narrowly confined: the question was whether the facts of this case

could be brought within the *Goldfarb* holding. In the District Court's view, "any inquiry based upon [*Goldfarb*] must be twofold: 1) whether a 'substantial' volume of interstate commerce is involved in the overall real estate transaction, and 2) whether the challenged activity is an essential, integral part of the transaction and inseparable from its interstate aspects." 432 F. Supp., at 984. The District Court assumed, *arguendo,* that the title insurance and financing aspects of the New Orleans residential real estate market were interstate in character, but ruled that federal jurisdiction was not established because in its view "the inescapable conclusion to be drawn from the evidence is that the participation of the broker in these (presumably interstate) phases of the real estate transaction is an incidental rather than indispensable occurrence in the transactional chain of events." *Id.,* at 985.

The United States Court of Appeals for the Fifth Circuit affirmed the dismissal of the complaint. 583 F. 2d 1315 (1978). Examining first the specific acts complained of in this case, the Court of Appeals concluded that they failed to satisfy the "in commerce" test. Realty was viewed as a quintessentially local product, and the brokerage activity described in the pleadings was found to occur wholly intrastate. *Id.,* at 1319. Second, that court rejected petitioners' "effect on commerce" argument. The interpretation of *Goldfarb* that had guided the District Court's analysis was adopted by the Court of Appeals, which ruled that "unlike the attorneys in *Goldfarb* whose participation in title insurance was statutorily mandated, real estate brokers are neither necessary nor integral participants in the 'interstate aspects' of realty financing and insurance." 583 F. 2d, at 1321–1323.

The Court of Appeals noted that the District Court had styled its judgment as a dismissal under Federal Rule of Civil Procedure 12 (b)(6) for failure to state a claim upon which relief could be granted, to be treated as a summary judgment insofar as matters outside of the pleadings were considered.

The Court of Appeals concluded that the appropriate designation of the dismissal was for lack of subject-matter jurisdiction under Rule 12 (b)(1), and affirmed the dismissal on that basis.

We granted certiorari. 441 U. S. 942.

## II

### A

The broad authority of Congress under the Commerce Clause has, of course, long been interpreted to extend beyond activities actually *in* interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially *affect* interstate commerce. *Wickard* v. *Filburn,* 317 U. S. 111 (1942); *United States* v. *Darby,* 312 U. S. 100 (1941). This Court has often noted the correspondingly broad reach of the Sherman Act. *Hospital Building Co.* v. *Rex Hospital Trustees,* 425 U. S. 738, 743 (1976); *United States* v. *Employing Plasterers Assn.,* 347 U. S. 186, 189 (1954); *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, 558 (1944); *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427, 435 (1932). During the near century of Sherman Act experience, forms and modes of business and commerce have changed along with changes in communication and travel, and innovations in methods of conducting particular businesses have altered relationships in commerce. Application of the Act reflects an adaptation to these changing circumstances. Compare *United States* v. *E. C. Knight Co.,* 156 U. S. 1, 12–15 (1895), and *Hopkins* v. *United States,* 171 U. S. 578, 587–592 (1898), with *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.,* 334 U. S. 219, 231–235 (1948), and *United States* v. *Employing Plasterers Assn., supra,* at 189.

The conceptual distinction between activities "in" interstate commerce and those which "affect" interstate commerce has been preserved in the cases, for Congress has seen fit to pre-

serve that distinction in the antitrust and related laws by limiting the applicability of certain provisions to activities demonstrably "in commerce." *United States* v. *American Building Maintenance Industries,* 422 U. S. 271 (1975); *Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U. S. 186 (1974); *FTC* v. *Bunte Bros., Inc.,* 312 U. S. 349 (1941). It can no longer be doubted, however, that the jurisdictional requirement of the Sherman Act may be satisfied under either the "in commerce" or the "effect on commerce" theory. *Hospital Building Co.* v. *Rex Hospital Trustees, supra,* at 743; *Gulf Oil Corp.* v. *Copp Paving Co., supra,* at 194–195; *United States* v. *Women's Sportswear Manufacturers Assn.,* 336 U. S. 460, 464 (1949); *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co., supra,* at 235–237.

Although the cases demonstrate the breadth of Sherman Act prohibitions, jurisdiction may not be invoked under that statute unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce. To establish jurisdiction a plaintiff must allege the critical relationship in the pleadings and if these allegations are controverted must proceed to demonstrate by submission of evidence beyond the pleadings either that the defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce. *Gulf Oil Corp.* v. *Copp Paving Co., supra,* at 202.

To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that

are alleged to be unlawful. The validity of this approach is confirmed by an examination of the case law. If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect. This is not the rule of our cases. See *American Tobacco Co.* v. *United States,* 328 U. S. 781, 811 (1946); *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 225, n. 59 (1940). A violation may still be found in such circumstances because in a civil action under the Sherman Act, liability may be established by proof of *either* an unlawful purpose or an anticompetitive effect. *United States* v. *United States Gypsum Co.,* 438 U. S. 422, 436, n. 13 (1978); see *United States* v. *Container Corp.,* 393 U. S. 333, 337 (1969); *United States* v. *National Assn. of Real Estate Boards,* 339 U. S. 485, 489 (1950); *United States* v. *Socony-Vacuum Oil Co., supra,* at 224–225, n. 59.

Nor is jurisdiction defeated in a case relying on anticompetitive effects by plaintiff's failure to quantify the adverse impact of defendant's conduct. See *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 395 U. S. 100, 123–125 (1969); *Bigelow* v. *RKO Radio Pictures, Inc.,* 327 U. S. 251, 265–266 (1946). Even where there is an inability to prove that concerted activity has resulted in legally cognizable damages, jurisdiction need not be impaired, though such a failure may confine the available remedies to injunctive relief. See *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439, 452–463 (1945); *Keogh* v. *Chicago & N. W. R. Co.,* 260 U. S. 156 (1922).

**B**

The interpretation and application of our holding in *Goldfarb* v. *Virginia State Bar,* 421 U. S. 773 (1975), has figured prominently in this case. The District Court held that petitioners could establish federal jurisdiction only if the facts of

this case could be brought within *Goldfarb*. As previously noted, as interpreted by that court, "any inquiry based upon [*Goldfarb*] must be twofold: 1) whether a 'substantial' volume of interstate commerce is involved in the overall real estate transaction, and 2) whether the challenged activity is an essential, intergral part of the transaction and inseparable from its interstate aspects." 432 F. Supp., at 984. The Court of Appeals took a similar view of *Goldfarb*, holding that Sherman Act jurisdiction did not exist because petitioners had failed to demonstrate that real estate brokers are either necessary or integral participants in the interstate aspects of residential real estate financing and title insurance. 583 F. 2d, at 1322.

It is with the second phase of the analysis of the District Court and of the Court of Appeals that we disagree. The facts of *Goldfarb* revealed an application of the state bar association's minimum-fee schedule to fix fees for attorneys' title examination services. Since the financing depended on a valid and insured title we concluded that title examination was "an integral part" of the interstate transaction of obtaining financing for the purchase of residential property and, because of the "inseparability" of the attorneys' services from the title examination process, we held that the legal services were in turn an "integral part of an interstate transaction." 421 U. S., at 784–785. By placing the *Goldfarb* holding on the available ground that the activities of the attorneys were within the stream of interstate commerce, Sherman Act jurisdiction was established. The *Goldfarb* holding was not addressed to the "effect on commerce" test of jurisdiction and in no way restricted it to those challenged activities that have an integral relationship to an activity in interstate commerce. To adopt the restrictive interpretation urged upon us by respondents would return to a jurisdictional analysis under the Sherman Act of an era long past. It has been more than 30 years since this Court stated: "At this late day we are not

willing to take that long backward step." *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.,* 334 U. S., at 235.

## C

On the record thus far made, it cannot be said that there is an insufficient basis for petitioners to proceed at trial to establish Sherman Act jurisdiction. It is clear that an appreciable amount of commerce is involved in the financing of residential property in the Greater New Orleans area and in the insuring of titles to such property. The presidents of two of the many lending institutions in the area stated in their deposition testimony that those institutions committed hundreds of millions of dollars to residential financing during the period covered by the complaint. The testimony further demonstrates that this appreciable commercial activity has occurred in interstate commerce. Funds were raised from out-of-state investors and from interbank loans obtained from interstate financial institutions. Multistate lending institutions took mortgages insured under federal programs which entailed interstate transfers of premiums and settlements. Mortgage obligations physically and constructively were traded as financial instruments in the interstate secondary mortgage market. Before making a mortgage loan in the Greater New Orleans area, lending institutions usually, if not always, required title insurance, which was furnished by interstate corporations. Reading the pleadings, as supplemented, most favorably to petitioners, for present purposes we take these facts as established.

At trial, respondents will have the opportunity, if they so choose, to make their own case contradicting this factual showing. On the other hand, it may be possible for petitioners to establish that, apart from the commerce in title insurance and real estate financing, an appreciable amount of interstate commerce is involved with the local residential real estate market arising out of the interstate movement of people, or otherwise.

To establish federal jurisdiction in this case, there remains only the requirement that respondents' activities which allegedly have been infected by a price-fixing conspiracy be shown "as a matter of practical economics" to have a not insubstantial effect on the interstate commerce involved. *Hospital Building Co.* v. *Rex Hospital Trustees,* 425 U. S., at 745; see *Goldfarb* v. *Virginia State Bar, supra,* at 784, n. 11; *Burke* v. *Ford,* 389 U. S. 320, 321–322 (1967). It is clear, as the record shows, that the function of respondent real estate brokers is to bring the buyer and seller together on agreeable terms. For this service the broker charges a fee generally calculated as a percentage of the sale price. Brokerage activities necessarily affect both the frequency and the terms of residential sales transactions. Ultimately, whatever stimulates or retards the volume of residential sales, or has an impact on the purchase price, affects the demand for financing and title insurance, those two commercial activities that on this record are shown to have occurred in interstate commerce. Where, as here, the services of respondent real estate brokers are often employed in transactions in the relevant market, petitioners at trial may be able to show that respondents' activities have a not insubstantial effect on interstate commerce.

It is axiomatic that a complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley* v. *Gibson,* 355 U. S. 41, 45–46 (1957); see 5 C. Wright & A. Miller, Federal Practice and Procedure §§ 1202, 1205–1207, 1215–1224, 1228 (1969). This rule applies with no less force to a Sherman Act claim, where one of the requisites of a cause of action is the existence of a demonstrable nexus between the defendants' activity and interstate commerce. Here, what was submitted to the District Court shows a sufficient basis for satisfying the Act's jurisdictional requirements under the effect-on-commerce theory so as to

entitle the petitioners to go forward. We therefore conclude
that it was error to dismiss the complaint at this stage of the
proceedings. The judgment of the Court of Appeals is va-
cated, and the case is remanded for further proceedings
consistent with this opinion.

*Vacated and remanded.*

MR. JUSTICE MARSHALL took no part in the consideration
or decision of this case.