738 F.2d 439
 1984-1 Trade Cases 66,054
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
W. Thomas McElhinney, M.D.
v.
The Medical Protective Co., et al.
 No. 82-5636.
 United States Court of Appeals, Sixth Circuit
 Filed June 5, 1984.
 
 1
 Before: JONES and KRUPANSKY, Circuit Judges; and COOK, District Judge.*
 
 
 2
 KRUPANSKY, Cir. J.
 
 
 3
 This is an appeal by Dr. Thomas McElhinney (McElhinney), a surgeon practicing in Northern Kentucky, from a directed verdict entered on behalf of defendants Booth Hospital and nine physicians on the hospital staff wherein the trial judge found that McElhinney had adduced insufficient evidence to permit jury consideration of plaintiff's claim that the defendants conspired to prevent patient referrals to McElhinney in violation of Section 1 of the Sherman Act, 15 U.S.C. Sec. 1. Essentially, the district court determined that six of the defendant physicians unilaterally decided not to deal with McElhinney, which is permissible for an individual under antitrust law, and that the hospital and remaining three physicians, while arguaby acting in concert, did not violate the "Rule of Reason" because the motive for refusing to deal was not the creation of economic power but maintenance of professional standards, and because the alleged "boycott" had only a de minimis effect upon the plaintiff.
 
 
 4
 On review, it is apparent that the most critical inquiry focuses upon the basis by which a court may initially assume jurisdiction in Sherman Act cases and upon the evidence adduced by the instant plaintiff to satisfy the jurisdictional test. Specifically at issue is the proper formulation of the causal chain which links the challenged activity of a defendant to interstate commerce.
 
 
 5
 McElhinney is a general surgeon on the staff of Booth Hospital, a facility operated by the Salvation Army and recently relocated from Covington to Florence, Kentucky. Upon becoming exclusively associated with Booth in 1969, McElhinney became embroiled in a series of personal and professional disputes with other staff physicians. In 1973, these incidents, which included ethnic slurs and a physical assault upon a member of the medical staff, prompted the full staff, by vote taken at its regular monthly meeting, to direct the Executive Committee to investigate and prepare a report on McElhinney.
 
 
 6
 The Executive Committee report did not recommend denying staff privileges to McElhinney; nonetheless, the staff voted by secret ballot to recommend to the Board that McElhinney not be re-appointed. McElhinney thereupon obtained a state court injunction which mandated that a full "due process" hearing be conducted and another vote taken. The result of these new hearings was identical and, subsequent to the dissolution of the injunction, McElhinney was denied staff privileges by the Board on February 5, 1974, retroactive to January 1973.
 
 
 7
 McElhinney appealed to the Court of Appeals (now the Supreme Court) of Kentucky, which, on July 18, 1974, imposed its own temporary injunction pending a hearing on the merits, prohibiting Booth from terminating McElhinney. Over two years later, on July 30, 1976, the Kentucky Supreme Court ruled that although McElhinney received a "sufficiently fair" hearing, the hospital action was arbitrary since its by-laws were "vague and ambiguous" in defining the causes for canceling a physician's staff privileges as well as the procedure to be implemented for accomplishing this result. Noting that Booth Hospital by-laws allowed termination upon "[a] violation of sufficient gravity to warrant such action," the Kentucky Supreme Court opined:
 
 
 8
 The express standards, vague though they may be, do not condemn criticism relating to the treatment of patients or hospital practice nor do they proscribe inability to get along with some doctors or hospital personnel. We express no opinion as to the validity of a reasonably definite standard undertaking to proscribe and made a cause of termination inability to work in harmony with other hospital personnel.
 
 
 9
 McElhinney was thus reinstated to the Booth staff. However, by letter dated April 19, 1977, Dr. Howard Heringer (Heringer), a defendant herein who was president of the medical staff and presiding officer at the hearings, advised the administrator of Booth that he would resign from the staff if McElhinney's staff privileges were not terminated by the time the hospital moved to its new suburban location in Florence, Kentucky. The administrator immediately forwarded a letter to the regional supervisor in which he conjectured that Heringer's senior partner, Dr. Kumpe, "admits more patients than any other physician in this hospital," and if Heringer were to leave, then Kumpe would, in all probability, not use Booth since his patients could not be "covered" by Heringer when Kumpe was unavailable. The matter eventually was concluded when Kumpe determined not to refer patients to, or consult with, McElhinney.
 
 
 10
 McElhinney initiated the present suit in 1978 alleging that the present defendants, various attorneys, four "John Doe" defendants, and an out-of-state medical insurance carrier doing business in Kentucky, conspired to prevent patient referrals to him in violation of Section 1 of the Sherman Act, 15 U.S.C. Sec. 1. Essentially, plaintiff's legal theory of the case, cast the insurance carrier, the physicians and attorneys active in medical malpractice litigation as conspirators to "eliminate" McElhinney "as a competitor in the practice of medicine" in order to prevent McElhinney from identifying physicians at Booth who were guilty of malpractice. Accordingly, the physicians involved, their attorneys and their insurer would arguably have an economic motive in restraining competition on the basis of competence, and a clear nexus with interstate commerce would arise from the interstate payment of insurance premiums, claims and/or court awards. McElhinney's Amended Complaint, filed approximately three years later, further alleged that the defendant insurance carrier insured between 80% to 85% of the physicians in Kenton and Campbell counties and that the company expended "substantial sums" to defend or settle malpractice suits. Two other arguably jurisdictional allegations were also advanced. First, McElhinney asserted that the alleged boycott initiated by purportedly incompetent physicians and their insurer "did affect the quality of medical care * * * [afforded] to interstate travelers passing through the Northern Kentucky area on Interstate 75." Further, McElhinney contended that the staff at Booth included residents of Ohio as well as Kentucky. Thus, McElhinney's stated theory was that a boycott, organized to reduce interstate insurance payments, precluded operation of "a free market" choice of physicians by local and interstate patients. During trial, McElhinney voluntarily dismissed his claims against the insurance carrier, the county medical society and five individuals. He pursued only the case against the hospital and the remaining nine individual physicians.
 
 
 11
 In its memorandum opinion granting the motion for a directed verdict, the trial court addressed the issue of jurisdiction by initially adopting a broad reading of McLain v. Real Estate Board of New Orleans, Inc., 444 U.S. 232, 100 S.Ct. 502 (1980) wherein the Supreme Court had ruled that jurisdiction over a Sherman Act, Section One claim could be established by showing "either that defendants' activity is itself in interstate commerce or, if it is local in nature, that it has an effect on some other appreciable activity demonstrably in interstate commerce." Id. at 242. The district court below, relying upon Western Waste Service v. Universal Waste Control, 616 F.2d 1094 (9th Cir.), cert. denied, 449 U.S. 869 (1980), found that McLain was satisfied simply by proving a nexus "between interstate commerce and a defendant's general business activity rather than defendant's allegedly unlawful conduct." Thus, the court founded its jurisdiction over McElhinney's complaint upon the following facts: Booth had received two million dollars per year in Medicare payments; Booth had admitted 5,000 out-of-state patients per year; seventy-eight percent of hospital supplies were purchased out-of-state; staff physicians maintained a practice out-of-state; and, hospital capital improvements were federally funded. Moreover, the trial court observed that McElhinney treated Medicare and Medicaid patients during the years at issue.
 
 
 12
 In applying the "effects upon interstate commerce" test, circuit courts are divided as to whether Sherman Act jurisdiction may be established when any business activity of the defendant affects interstate commerce, Western Waste Service v. Universal Waste Control, supra, or if jurisdiction requires proof that the particular business activity challenged by the plaintiff affects interstate commerce. Cordova & Simonpietri Insurance Agency v. Chase Manhattan Bank, 649 F.2d 36, 45 (1st Cir.1981); Crane v. Intermountain Health Care, Inc., 637 F.2d 715, 719-722 (10th Cir.1981) (en banc ). This Circuit is aware of the division of authority but has pointedly avoided addressing the conflicting interpretations of McLain. See Tarleton v. Meharry Medical College, et al., No. 82-5449, slip op. at 16 (6th Cir. Sept. 20, 1983); James R. Snyder Co., Inc. v. Associated Gen. Contr., etc., 677 F.2d 1111, 1115 n. 3 (6th Cir.1982).
 
 
 13
 In a recent opinion crafted by Judge Newman, the Second Circuit analyzed the conflicting interpretations of McLain and correctly emphasized that the basis for the restricted views espoused by the First and Tenth Circuits is demonstrably the rule mandated by the Supreme Court. In Furlong v. Long Island College Hospital, 710 F.2d 922 (2d Cir.1983), the court addressed, as here, a claim that a hospital and various staff members acted in concert to deprive a physician of staff privileges in restraint of trade. As in the matter at bar, the ultimate jurisdictional foundation was alleged to be interstate commerce in third-party patient payments, hospital supplies and services, and federal construction subsidies. Id. at 924. The district court dismissed the claim as beyond its jurisdiction. On appeal, the court initially considered the proper interpretation to be afforded to McLain in examining the scope of the defendant's business activity. The critical insight developed in Furlong is that, while the specifically challenged business practices need not directly affect interstate commerce, the allegedly unlawful conduct must be shown to "infect" those business activities of the defendant which do, or are likely to, affect interstate commerce. Indeed, this is the plain import of the Supreme Court's own formulation of the jurisdictional standard which states that if the contested practice "is local in nature," that is, not itself in interstate commerce, then the challenged conduct must be shown to have "an effect on some other appreciable activity demonstrably in interstate commerce." 444 U.S. at 242 (emphasis added). The Furlong court stated:
 
 
 14
 We agree with the First and Tenth Circuits that it would not be prudent to extract from McLain a generalized rule that antitrust jurisdiction can be established simply by showing that some aspects of a defendant's business have a relationship to interstate commerce. Rather the inquiry must be whether the defendant's activity that has allegedly been "infected" by unlawful conduct can be shown " 'as a matter of practical economics' to have a not insubstantial effect on the interstate commerce involved." McLain, supra, 444 U.S. at 246, 100 S.Ct. at 511, quoting Hospital Building Co. v. Rex Hospital Trustees, 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 388 (1976). The requisite showing will vary with the type of unlawful conduct alleged. With a price-fixing allegation, as in McLain, the link between the "infected" activities and an ultimate effect on commerce was easily posited, since price-fixing is generally recognized as tending to restrict output, and the complaint adequately alleged interstate activities--real estate financing and title insurance--that would be adversely affected if the local brokerage activities of the defendants were diminished. In prior cases, the Court has spelled out in more detail the causal chain by which the alleged illegality could be expected to affect the relevant lines of commerce. Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 235-44, 68 S.Ct. 996, 1005-1010, 92 L.Ed. 1328 (1948). We therefore conclude that a plaintiff must allege sufficient facts concerning the alleged violation and its likely effect on interstate commerce to support as inference that the defendants' activities infected by illegality either have had or can reasonably be expected to have a non insubstantial effect on commerce.
 
 
 15
 710 F.2d at 9246.
 
 
 16
 On review, it is apparent from the record that McElhinney did not establish or allege any facts relating the truncated conspiracy of Booth Hospital and nine staff physicians, which was all that remained of the plaintiff's case after his voluntary dismissal of the insurance company and other defendants, to the treatment of interstate highway emergencies or the use of federal construction funds. It is of some concern that the plaintiff, who originally pled facts outlining a conspiracy arising from the interstate payment of malpractice insurance premiums, claims and/or awards, totally abandoned the theory and its jurisdictional inferences at trial. There are simply no allegations in the complaint or the amended complaint as to the nature of the antitrust claim which would survive the amputation of the principal's incorporated into the alleged conspiracy. The willingness of the trial court to permit McElhinney to pursue a Sherman Act claim upon some general proof of the hospital's interstate contacts essentially permitted McElhinney to avoid formulating a theory of his case or pleading jurisdiction. In its final form, McElhinney's complaint failed to set forth facts from which the jurisdiction of the court, based on the remaining defendants' activities, could be inferred.[1]
 
 
 17
 Similarly, McElhinney has not sufficiently pled or proven facts which could establish a nexus with interstate commerce based upon his own business activities. As in Furlong, McElhinney alleged that a substantial portion of his income derived from third-party payments by out-of-state insurers. The Supreme Court, in Hospital Building Co. v. Rex Hospital Trustees, 425 U.S. 738, 96 S.Ct. 1848 (1976), has sanctioned the loss of revenue from out of state as being among a "combination of factors," 425 U.S. at 744, 96 S.Ct. at 1852, that will constitute adequate pleading of a substantial effect on interstate commerce with respect to a plaintiff's activities. Without violating McLain's holding that a plaintiff not be required to make a "particularized showing" of the effect on commerce, a plaintiff, particularly one who, like McElhinney, is not facing pre-trial dismissal but is at the point of proof, must show that in practical economic terms, the challenged activity logically creates "appreciable and 'unreasonable burdens on the free and uninterrupted flow' of commerce" in his business. Crane v. Intermountain Health Care, Inc., 637, F.2d 715, 725 (10th Cir.1980) (en banc ). The evidence below was found by the trial judge to indicate merely a de minimis effect on plaintiff's business by the defendant's conduct. Although the district court viewed this failure of proof by McElhinney as going to the merits of the complaint and proving, in effect, that any restraint with such little effect was reasonable and not proscribed, it seems more correct to interpret the absence of proof as to the manner by which the purportedly improper conduct could affect commerce, or infect an activity that does affect commerce, as a deficiency of jurisdiction.
 
 
 18
 Accordingly, this court is constrained to conclude that the present complaint, which was developed at trial by plaintiff's evidence, was not adequate to invoke the trial court's jurisdiction and is properly remanded for an Order dismissing it with prejudice.
 
 
 
 *
 Hon. Julian Abele Cook, Jr., United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The trial court's own finding that the "record is void of evidence" concerning the actual or probable effect of the alleged group boycott "on the rendering or receiving of medical services or supplies" within an interstate area indicates how completely the jurisdictional nexus was overlooked