**SHANNON & LUCHS, et al., Plaintiffs,**

v.

**MELLON BANK, N.A., Defendant.**

**Civ. A. No. 85–1093.**

United States District Court,
W.D. Pennsylvania.

Aug. 4, 1988.

As Corrected Aug. 16, 1988.

Lawrence Flatley, Ira Weston, Reed Smith Shaw & McClay, Pittsburgh, Pa., for defendant.

Stanley Levine, Campbell & Levine, Pittsburgh, Pa., Herbert A. Dubin, Silver Springs, Md., for plaintiffs.

OPINION

DUMBAULD, Senior District Judge.

This has been a troublesome case. The Court after review of the record and briefs called for oral argument, but emerged no wiser than before; somewhat resembling the poet Omar Khayam, who "heard great argument ... but evermore went out by the same door where in I went."

Mindful of the admonition attributed [1] to the late Calvert Magruder, a charming Maryland gentleman who for many years adorned the faculty of the Harvard Law School and the bench of the First Circuit Court of Appeals, to the effect that a District Judge should be courteous, prompt, and wrong, we shall spend no further time in ratiocination but shall take the bull by the horns, for better or worse, so that the case may be expedited for consideration by an appellate tribunal whose members are equipped with three law clerks rather than none. We shall not follow the aleatory methods of the legendary Judge Bridlegoose.[2] but rather the Brandeis practice of

1. By Judge Edward T. Gignoux, address at annual dinner of the American Law Institute, May 19, 1972, 49th Annual Meeting, Proceedings 1972, 477.

2. John Marshall Gest, "The Trial of Judge Bridlegoose As Reported by Francois Rabelais," paper read before the Pennsylvania Bar Association, June 26, 1923, Report of the 29th Annual

first himself preparing a statement of the facts of the case, while relying upon his law clerks to assemble the applicable authorities.[3]

Cross-motions for summary judgment by plaintiffs and defendant are before the Court. Plaintiffs (Shannon & Luchs Co., a District of Columbia corporation authorized to do business in Pennsylvania as a real estate broker, hereinafter called Shannon & Luchs, and Warren K. Montouri, Inc., a District of Columbia broker not so authorized, hereinafter called Montouri) seek a commission allegedly arising out of an agreement with defendant (Mellon Bank, N.A., hereinafter called Mellon) concerning an aborted sale by defendant of the Union Trust Company building in Pittsburgh to plaintiffs' customer Dr. Laszlo N. Tauber, a surgeon practicing in Alexandria, Virginia.

### The Course of Negotiations

Jon W. Barker, an employee of plaintiff Shannon & Luchs, who is individually licensed in Texas and the District of Columbia, but not in Pennsylvania, as a real estate broker, was looking for sale-lease back properties for Dr. Tauber, and happened to read in The Wall Street Journal about a pending sale of a building now known as One Mellon Bank Center by Mellon to Integrated Resources.

In August of 1983, by telephone Barker informed David M. Knight, a Mellon Senior Vice President, that he had a customer who would be interested if the Integrated Resources deal did not go through. Barker was referred to David J. Neustadt, a lawyer in Mellon's law department. After telephone calls and letters, Barker was invited to visit Knight and Neustadt in Pittsburgh, and did so on November 15, 1983. These discussions related to sale and lease-back of the Union Trust Building (not the building mentioned in the Wall Street Journal article).

On December 9, 1983, Barker wrote Neustadt outlining terms for a sale-leaseback, item 1 of which provided for a sale price of $30 million cash, and item 7 of which provided that "A commission of $650,000 from the proceeds of the purchase monies are (sic) to be paid and distributed equally between Shannon & Luchs company and Warren Montouri, a real estate broker and consultant to the purchaser."[4]

A letter from Barker to Montouri, dated November 17, 1983,[5] indicates that Mellon expected the buyer to spend $35 million more to rehabilitate the building over a three year period. Buyer would receive tax benefits as Union Trust was a registered historic landmark.

On February 3, 1984, Dr. Tauber wrote to Knight (apparently following "our meeting yesterday") confirming his intent to purchase at a price of $40 million plus commission.[6]

Apparently after a further meeting on February 6, Mellon transmitted through Baskin & Sears, a Pittsburgh law firm, a letter of February 7, 1984, offering to sell at a price of $8,200,000. Buyer was to "retrofit" the building at a cost of at least $32 million. This amount was to be available at the time of closing, in addition to the $8.2 million price payable at the same time in cash or certified check.

This document, with revisions in ink, bears the signature of "David M. Knight S.V.P." for Mellon, and also the signature, dated "2/8/84" of "Laszlo N. Tauber, M.D."

---

Meeting of the Pennsylvania Bar Association (1923) 235, 239–42.

**3.** According to Paul Freund, "This was his assurance that he would not be seduced by the fascination of legal analysis until he had grounded himself in the realities of the case as they were captured in the record." Dumbauld, "Legal Records in English and American Courts," 36 The American Archivist (January, 1973) 15, 32: "In my own judicial experience, in doubtful cases where it is uncertain what the decision should be, I have often found it helpful to begin work by preparing a careful and comprehensive statement of the facts. Usually from such an analysis of the facts, the controlling principles of law will gradually emerge and become discernible."

**4.** Barker dep. Ex. 5.

**5.** Barker dep. Ex. 6.

**6.** Barker dep. Ex. 7.

Paragraph 6 provides regarding commissions: "Seller agrees to pay a real estate commission of $200,000.00 to Shannon & Luchs AND WARREN MONTOURI. The parties will otherwise agree to save each other harmless on account of such fees."[7] The letter also contained a paragraph reciting that "This offer is not intended to be contractual in nature. It is only an expression of the basis on which Seller would consider entering into an Agreement of Sale for the Building." It concludes with a paragraph stating that: "This offer will be null and void unless a copy of this letter signed by Buyer together with satisfactory evidence that Buyer has available funding in an amount of not less than $40,200,-000.00 is received by Seller no later than February 15, 1984."

On March 23, 1984, Neustadt wrote Barker confirming that the offer of February 7, 1984 had "by its own terms become null and void on February 15, 1984 because of the failure of Dr. Tauber to furnish Mellon Bank with satisfactory evidence of available financing." But he indicated that negotiations could be resumed if the building is still on the market if Dr. Tauber sent Mellon $1 million as a "good faith deposit."[8] Dr. Tauber on April 2, 1984, sent a check for that amount to be cashed at settlement, but Mellon insisted upon an immediate deposit in Mellon Bank.[9]

On April 6, 1984, Neustadt sent by telex the wording of an offer to be submitted by Dr. Tauber, directing that if Dr. Tauber is satisfied he should sign the copies being sent by express mail and return them with the "deposit" [of $1 million] to David Knight as soon as possible.[10]

The April 12, 1984, agreement[11] provides, with respect to commissions, that "Seller agrees to pay a real estate commission of USD 200,000 to be divided between Shannon & Luchs and Warren Montouri. The parties will otherwise agree to save each other harmless on account of such fees.[12] The following paragraph provided that buyer pay all closing costs. These include title insurance, transfer taxes and recording fees.[13]

Paragraph 2 deals in detail with disposition of the $1 million "deposit," and interest thereon at 10 percent. The pertinent provisions read:

A. If this offer is accepted by seller, the deposit and the interest earned thereon shall be credited to the purchase price at the time and place of final closing.

B. If this offer is rejected by seller, the deposit and interest earned thereon shall immediately be returned to buyer.

C. If prior to the execution of a definitive agreement of sale buyer elects to withdraw from the proposed transaction, seller shall return the deposit, less the interest earned thereon.

D. If prior to the execution of a definitive agreement of sale, seller elects to withdraw from the proposed transaction, seller shall return the deposit together with all interest thereon.

E. If buyer, after execution of a definitive agreement of sale is unable or unwilling to perform in full accordance with

7. Barker dep. Ex. 9. The insertion in all caps is in a hand apparently different from other additions. It was made by Barker. The others were by Dr. Tauber. Barker dep. p. 75.

8. Barker dep. Ex. 10.

9. Barker dep. Ex. 11; Barker dep. p. 80.

10. Barker dep. Ex. 14. This telex contains changes in ink by Dr. Tauber and bears his signature as trustee [this to permit sale of an interest to other investors]. On Ex. 14 Knight's signature is a conformity copy. Ex. 15 contains the April 6 letter in less reduced type but in addition to Tauber's signature bears that of David M. Knight, Senior Vice President, for Mellon, dated April 12, 1984. Apparently the record does not contain the copies sent by ex-

press mail, if they were in fact signed by the parties, unless they appear as Barker dep. Ex. 13, which Barker had never seen before his deposition. Barker dep. p. 95. Barker dep. Ex. 15 apparently constitutes the final form of the agreement. Barker dep. p. 98.

11. See note 10, *supra*.

12. This is the *sedes materiae* governing disposition of the case at bar. Plaintiffs' whole case rests upon the obligation allegedly created by the language here quoted.

13. Mellon's attempt to add "seller's legal fees" was stricken out by Dr. Tauber.

the agreement of sale, he shall thereupon forfeit to seller the deposit and the interest thereon.

### Subsequent Action by the Parties

Mellon elected to withdraw from the sale because of premature publicity concerning it.[14]

In a memorandum of a telephone call from Knight, Barker noted "Bank does not want to do business with Dr Tauber _____ because [of] premature announcements. Wants acct # to wire back money."[15]

Accordingly defendant did return the deposit with interest to Dr. Tauber, who accepted it.[16] Dr. Tauber is not a party to the case at bar. No action for specific performance of the sale or for damages has ever been brought.

### Construction of the Agreement

■ None of the parties has advanced the argument that the agreement of April 12, 1984, is illusory because no one is bound by it. Defendant concedes, in fact, that it is a valid agreement, but limited in scope. According to defendant, its sole effect relates to disposition of the $1 million deposit, and hence it is now *functus officio*.

We agree that the above-quoted language does give each party an implied right to withdraw from the proposed transaction. Mellon's action is authorized by paragraph 2–D. The payment of accrued interest thereunder may be regarded as liquidated damages.

We are of opinion that the agreement is not an illusory contract, but merely creates on behalf of a party having second thoughts a *condition subsequent*. The agreement may be regarded as similar to a revocable trust. It is not void *ab initio*, though it may be undone unilaterally. But it remains in full force and effect until such subsequent action takes place.

What is the effect of the above-described events upon the plaintiffs as a third-party beneficiary [17] of the agreement?

The compensation which plaintiffs are suing to collect is described in the agreement as a "real estate commission" Ordinarily a real estate commission is not earned if there is no sale consummated. But there is a qualification, upon which plaintiffs rely, that a broker representing a seller is entitled to his commission if he produces a buyer who is ready, willing, and able to buy but the seller arbitrarily refuses to complete the sale. But this rule does not help plaintiffs, as they did not represent Mellon but represented Dr. Tauber. We find as a fact and hold as a conclusion of law that plaintiffs never represented Mellon.[18]

Nevertheless that does not seem to be the end of the matter. Though described and characterized in the agreement as a real estate commission, substance rather than form should govern.

Compensation to brokers, like transfer tax, is a matter regarding which the parties are free to contract as they please.

Hence, after considerable thought, our ultimate conclusion is that plaintiffs should recover the compensation stipulated in the agreement simply because, in Shakespeare's language, it is "so nominated in the bond."[19] Or in Justice Frankfurter's phrase, the "independent potency" [20] of the

---

14. Just as President Lyndon Johnson withdrew appointments to office when the press correctly speculated in advance as to the name of the appointee.

15. Barker dep. Ex. 16.

16. Barker dep. p. 116.

17. Pennsylvania recognizes that a broker can be a third-party beneficiary of a contract between buyer and seller. *Wray v. Bowman,* 74 Pa.Super. 479, 481–82 (1920).

18. It is simply sophistry *pour les besoins de la cause* when Barker says a broker represents in a fiduciary capacity whoever is paying his commission. Barker dep. p. 41, 88.

19. Merchant of Venice, Act IV, sc. 1, 1. 57.

20. *Adamson v. California,* 332 U.S. 46, 66, 67 S.Ct. 1672, 1682, 91 L.Ed. 1903 (1947). The Justice was there referring to the Fourteenth Amendment's direct commands to the States as distinguished from requirements borrowed from the first ten Amendments (the Bill of

contract provision supports recovery. Mellon should pay because it agreed to do so. Why it did is speculative. It was suggested at argument that it may have been for tax reasons, to enable the buyer to have a higher basis for the acquired property. The evidence does indicate, however, and the Court finds as a fact, that it was Mellon that determined the amount to be payable as compensation. Dr. Tauber would have been willing for his brokers to have received a larger commission.[21]

Mellon may have felt that it was fair and equitable to pay plaintiffs for their work on the proposed sale, which fell through because of withdrawal on Mellon's part, with no fault attributable to plaintiffs.[22]

Mellon did have a substantial interest in effecting the sale of the Union Trust Building. By virtue of the lease-back it continued doing business at the same old stand, but with the infusion of $32 million dollars of someone else's money to renovate and rehabilitate and modernize the historic structure.[23]

### Subsidiary Defenses

■ Assuming that plaintiffs may recover by virtue of the contractual obligation assumed by Mellon, it remains to consider other defenses advanced by defendant, not relating to interpretation of the contract.

These rely upon the lack of authorization by plaintiffs to act as real estate brokers in Pennsylvania, in the light of the Commonwealth's regulations affecting that occupation.

It is undisputed that all the actual work on the part of the buyer, Dr. Tauber, in connection with the Union Trust transaction was done by Jon W. Barker, and that he is not licensed individually in Pennsylvania.

But it is also undisputed that plaintiff Shannon & Luchs is authorized to do business in Pennsylvania, and that at all relevant times Barker was an employee of Shannon & Luchs and did all that he did in that capacity. We hold that plaintiff Shannon & Luchs is not precluded from collecting under the contract by reason of this defense.

We are inclined also to accept the theory advanced on behalf of plaintiff Montouri that out of State real estate brokers may lawfully participate in joint ventures with locally licensed brokers. This position is supported by the opinion of Judge Lipez in *Gold & Co. Inc. v. Northeast Theater Corporation*, 281 Pa.Super, 69, 74–75, 421 A.2d 1151 (1980).

Moreover, there is an important consideration not emphasized by counsel which must not be overlooked. That is the significant federal interest in the health of the national economy by promoting the investment of capital from one part of the nation in real estate located elsewhere.[24]

The significant national interest in interstate investment in real estate is highlighted by the holding in *McLain v. Real Estate Board of New Orleans*, 444 U.S. 232, 238–39, 244–45, 100 S.Ct. 502, 510–11, 62 L.Ed. 2d 441 (1980), that price-fixing by local real estate brokers has an impact on interstate commerce and is subject to the antitrust laws.

A similar trend appears in a recent case, *Supreme Court of Virginia v. Freedman*, decided June 20, 1988, where admission of non-residents to practice law was protected

---

Rights) by way of the "selective incorporation theory."

**21.** Barker dep., pp. 53, 70.

**22.** It is not clear who was responsible for the premature publicity. Barker denies any culpability. Barker dep. p. 115.

**23.** Perhaps Knight and Neustadt regretted that their labors went down the drain. Barker dep. p. 118. Perhaps like Oliver North they were acting in accordance with the "highest authori-

ty." There may have been some civic pressure (akin to the efforts of the late Mayor Caliguiri to keep the Pirates in Pittsburgh) to sell the well-known landmark to a Pittsburgh group. Such a speculation was mentioned by someone, but there is no evidence of record why the deal collapsed.

**24.** Historians may recall the significant influence of English investors in the development of the West, and the establishment of a national railroad network, important for national defense in World War II.

as a privilege or immunity "bearing on the vitality of the Nation as a single entity" (slip opn. p. 5).

These Supreme Court decisions admonish us to interpret the Pennsylvania protectionist legislation regarding real estate dealings in a liberal fashion, in a manner so as to avoid raising any questions of constitutionality.

Chief Justice Stone's opinion in the landmark case of *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 774–75, 65 S.Ct. 1515, 1522–23, 89 L.Ed. 1915 (1945), points in the same direction. There an Arizona statute limiting the length of railroad trains was stricken down as an undue burden on interstate commerce. The ostensible purpose of the State regulation as an exertion of police power to protect public safety was stronger there than in the case of the Pennsylvania real estate restrictions.

In the case at bar we are not dealing with babes in the woods, as in consumer-oriented legislation (such as the Truth in Lending Act [25] or the Interstate Land Sales Act [26] which directly affects real estate closings and financing in some degree), but with dealings between substantial and sophisticated men of affairs.

It would be contrary to the policy proclaimed by the Supreme Court if courts were to be alarmed by the performance of necessary negotiations essential to the completion of interstate investment transactions, and take umbrage at discussions by Mr. Barker in Pittsburgh as being unlawful practice of the calling of real estate broker or salesman, or at Mr. Neustadt's discussions in Washington [27] as being unlawful practice of law in the District of Columbia (assuming he is not admitted there).[28]

For the foregoing reasons we conclude that the subsidiary defenses are lacking in merit, and that since the defendant is liable for the compensation sued for by reason of the obligation voluntarily assumed as part of the contract terms, properly construed, judgment should be rendered for the plaintiffs and against the defendant.

This opinion shall be deemed to constitute the Court's Findings of Fact and Conclusions of Law.

---

**25.** 15 U.S.C. 1601 et seq.

**26.** 15 U.S.C. 1701 et seq.

**27.** Barker dep. p. 80.

**28.** According to the 1987 Martindale, Mr. Neustadt is admitted in Ohio, but not in Pennsylvania. (Is the pot calling the kettle black?)