GF GAMING CORPORATION, d/b/a Famous Bonanza Casino, and Easy Street Casino, a Colorado corporation, Blue Spruce Investment Corporation, a Colorado corporation, Grimes Gaming Corporation, a Colorado corporation, Annie Oakley's Emporium, Inc., a Colorado corporation, Galactic Gaming, Inc., a Nevada corporation, Eureka Development Company, Inc., a Colorado corporation, Baby Doe Development, Inc., a Colorado corporation, and Sheftel Charitable Remainder Unitrust, an entity domiciled in Colorado, Plaintiffs,

v.

BLACK HAWK CASINO OWNERS ASSOCIATION, a Colorado political committee, Horseshoe Casino, LLC, d/b/a Canyon Casino, a Colorado limited liability company, Black Hawk Brewery and Casino, LLC, d/b/a Mardi Gras Casino, a Colorado limited liability company, Black Hawk Gaming and Development Co., Inc., a Colorado corporation, Black Hawk Development North, LLC, a Colorado limited liability company, BH Gateway, LLC, d/b/a Jackpot Springs, a Colorado limited liability company, Prospector 141, LLC, a Colorado limited liability company, Woodmont Development Company, Inc., a Texas corporation, David D. Spellman, individually, in his official capacity as a member of the City of Black Hawk Board of Aldermen and as agent for Black Hawk Development North, LLC, Haller G. Midcap, individually, in his official capacity as a member of the City of Black Hawk Board of Aldermen and as agent for Black Hawk Development North, LLC, Tom Kerr, individually, in his official capacity as a member of the City of Black Hawk Board of Aldermen and as agent for Black Hawk Development North, LLC, Kathryn Eccker, individually, and in her official capacity as Mayor of the City of Black Hawk, James S. Maloney, individually, and in his official capacity as City Attorney for the City of Black Hawk, Lynnette Hailey, individually, and in her official capacity as City Manager for the City of Black Hawk, Susan G. Barnes, an individual domiciled in Colorado, Medill Barnes, an individual domiciled in Colorado, Lary P. Brown, an individual domiciled in Colorado, Phyllis Brown, an individual domiciled in Colorado, and Herbert W. Bowles, an individual domiciled in Colorado, Defendants.

No. CIV.A. 01–D–0964MJW.

United States District Court, D. Colorado.

March 25, 2004.

Scott J. Eldredge, David P. Hersh, Diane Vaksdal Smith, David Edmond Wilson, Sarah Van Arsdale Berry, Burg, Simpson, Eldredge, Hersh & Jardine, P.C., Englewood, CO, William E. Myrick, William E. Myrick & Associates, Denver, CO, for plaintiffs.

Lee D. Foreman, Norman R. Mueller, Haddon, Morgan, Mueller, Jordan, Mackey & Foreman, PC, Denver, CO, Thomas S. Rice, Eric Michael Ziporin, Senter, Goldfarb & Rice, LLC, Denver, CO, Geoffrey Harrison Simon, Davis, Graham & Stubbs LLP, Denver, CO, Robert F. Hill, Jennifer H. Hunt, Hill & Robbins, P.C., Denver, CO, for City of Black Hawk, defendant.

Eric Michael Ziporin, Senter, Goldfarb & Rice, LLC, Denver, CO, Richard L. Harring, Grimshaw & Harring, P.C., Denver, CO, Geoffrey Harrison Simon, Davis, Graham & Stubbs, LLP, Denver, CO, for Black Hawk Casino Owners Assn., defendant.

Eric Michael Ziporin, Senter, Goldfarb & Rice, LLC, Denver, CO, Robert Arthur Dill, John Alonzo Hutchings, Patrick Dale Tooley, Dill, Dill, Carr, Stonbraker & Hutchings, Denver, CO, Geoffrey Harrison Simon, Davis, Graham & Stubbs, LLP, Denver, CO, for Horseshoe Casino, LLC, defendant.

Stanley L. Garnett, Andrew W. Loewi, Mark Todd Barnes, Brownstein, Hyatt & Farber,P.C., Denver, CO, Eric Michael Ziporin, Senter, Goldfarb & Rice, LLC, Denver, CO, Geoffrey Harrison Simon, Davis, Graham & Stubbs LLP, Denver, CO, for

Black Hawk Brewery and Casino, LLC, defendant.

Eric Michael Ziporin, Senter, Goldfarb & Rice, LLC, Denver, CO, Geoffrey Harrison Simon, Davis, Graham & Stubbs LLP, Denver, CO, Gary Lozow, Blain David Myhre, Mark Gary Grueskin, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, Lisa R. Brenner, Attorney General's Office, Denver, CO, for Black Hawk Gaming and Development, Inc., defendant.

Eric Michael Ziporin, Senter, Goldfarb & Rice, LLC, Denver, CO, Geoffrey Harrison Simon, Davis, Graham & Stubbs LLP, Denver, CO, B. Lawrence Theis, Tracy L. Ashmore, Musgrave & Theis, Denver, CO, for Black Hawk Development North, LLC, defendant.

Eric Michael Ziporin, Senter, Goldfarb & Rice, LLC, Denver, CO, Geoffrey Harrison Simon, Davis, Graham & Stubbs LLP, Denver, CO, for BH Gateway, LLC, defendant.

Eric Michael Ziporin, Senter, Goldfarb & Rice, LLC, Denver, CO, Geoffrey Harrison Simon, Davis, Graham & Stubbs LLP, Denver, CO, Richard S. Strauss, Hochstadt, Straw & Strauss, P.C., Denver, CO, Marco D. Chayet, Chayet, Young, Meegant & Dawson, LLC, Denver, CO, Jeffrey J. Cowman, Perkins Coie, LLP, Denver, CO, B. Lawrence Teis, Tracy L. Ashmore, Denver, CO, for Prospector 141, LLC, defendant.

Lee D. Foreman, Haddon, Morgan, Mueller, Jordan, Mackey & Foreman, PC, Denver, CO, Eric Michael Ziporin, Dale R. Harris, Geoffrey Harrison Simon, Davis, Graham & Stubbs, LLP, Denver, CO, for Medill Barnes, defendant.

Eric Michael Ziporin, Dale R. Harris, Geoffrey Harrison Simon, Davis, Graham & Stubbs, LLP, Denver, CO, for Susan G. Barnes, defendant.

Susan G. Barnes, Wheat Ridge, CO, pro se.

Medill Barnes, Wheat Ridge, CO, pro se.

Eric Michael Ziporin, Senter, Goldfarb & Rice, LLC, Denver, CO, Geoffrey Harrison Simon, Davis, Graham & Stubbs LLP, Denver, CO, B. Lawrence Theis, Tracy L. Ashmore, Musgrave & Theis, Denver, CO, for Herbert W. Bowles, defendant.

Geoffrey Harrison Simon, Davis, Graham & Stubbs LLP, Denver, CO, B. Lawrence Theis, Tracy L. Ashmore, Musgrave & Theis, Denver, CO, for Phyllis Brown, defendant.

Lee D. Foreman, Norman R. Mueller, Haddon, Morgan, Mueller, Jordan, Mackey & Foreman, PC, Denver, CO, Thomas S. Rice, Eric Michael Ziporin, Senter, Goldfarb & Rice, LLC, Denver, CO, Geoffrey Harrison Simon, Davis, Graham & Stubbs LLP, Denver, CO, Robert F. Hill, Jennifer H. Hunt, Hill & Robbins, P.C., Denver, CO, Michael T. McConnell, McConnell, Siderius, Fleischner, Houghtaling, & Craigmile, LLC, Denver, CO, for James S. Maloney, Kathryn Eccker, Lynette Hailey, defendants.

Eric Edward Torgerson, Scott David Albertson, Holley, ALbertson & Polk, P.C., Golden, CO, for Woodmont Development, defendant.

## ORDER

DANIEL, District Judge.

THIS MATTER is before the Court on Defendants' Joint Motion to Dismiss Antitrust Claims, filed July 3, 2003 ("Mot. to Dismiss"). Pursuant to FED. R. CIV. P. 12(b)(6), this motion seeks to dismiss Plaintiffs' Second Revised Third Amended Complaint [hereinafter "Second Revised Third Amended Complaint" or "SRTAC"] regarding Plaintiffs' first, second, and third claims. alleging a conspiracy to re-

strain trade in violation of 15 U.S.C. § 1, a conspiracy to monopolize in violation of 15 U.S.C. § 2, and attempted monopolization in violation of 15 U.S.C. § 2, respectively.

## I. Factual Background

The essence of Plaintiffs' allegations as set forth in the Second Revised Third Amended Complaint is that "Defendants engaged in and concealed a conspiracy to restrain and monopolize trade in the gaming industry in Gilpin County, Colorado in violation of federal and state statutory law," (SRTAC ¶ 33), and "[a]s a result of Defendants' conduct, Plaintiffs have incurred economic damages and losses." (*Id.* ¶ 34.) More specifically, Plaintiffs originally alleged that Black Hawk's Las Vegas style casinos are in violation of the Colorado constitutional amendment which provides that the purpose of limited gaming is to promote the historic preservation of the gambling towns. (*Id.* ¶¶ 38–50) (cit-

ing Colo. Const. Art. XVIII, § 9). As a result, it is alleged that Black Hawk's casinos unfairly compete with Central City's casinos, and unfairly and illegally undermine Plaintiffs' economic interests. (*Id.* ¶¶ 145–149.)

Specifically, Plaintiffs allege that their casinos are only accessible via State Highways 119 and 279, which pass through Black Hawk, and that Black Hawk uses its geographic position to control access to Central City.[1] (*Id.* ¶¶ 54, 55.) Of interest here, Plaintiffs assert that in an effort to counteract the advantage enjoyed by Black Hawk by way of its oversized casinos [2] and its control over access to Central City, Central City initiated plans to build a Southern Access Road which would give gamblers direct access to Central City without having to drive through Black Hawk. (SRTAC ¶¶ 58–59.)[3] Plaintiffs allege that Defendants[4] entered into a con-

---

1. Plaintiffs originally alleged that Black Hawk would frequently perform construction on both Highways as well as detour traffic off the highways in an effort to deter prospective customers from reaching Central City. (*Id.* ¶¶ 56, 57.) Plaintiffs also originally alleged that Black Hawk's Las Vegas-style casinos violate the Eighteenth Amendment to Colorado's Constitution, which provides that the purpose of limited gaming is to promote the historic preservation of the gambling towns. (*Id.* ¶¶ 38–50) (citing Colo. Const. art. XVIII, § 9). As a result, it was alleged that Black Hawk's casinos unfairly compete with Central City's casinos, and unfairly and illegally undermine Plaintiffs' economic interests. (*Id.* ¶¶ 145–149.) Both the allegations of building illegally large casinos or blocking and detouring traffic away from Central City have been dropped by Plaintiffs.

2. Claims that Black Hawk's Las Vegas-style casinos violate the Colorado Constitution have been withdrawn, *see* n.1, *supra*, but the allegation that Black Hawk's large casinos attract gamblers traveling the highways remains. *See* discussion of withdrawal at 8, *infra*.

3. Plaintiffs allege that Central City is accessible only through Highway 119, which runs directly through Black Hawk, that Black Hawk controls access to Central City and its casinos and businesses, and that Black Hawk performs frequent maintenance activities and detours which Plaintiffs allege are designed to deter prospective customers from accessing Central City. (*Id.* ¶¶ 58–61.)

4. Defendants at this point include several private casinos and associations in Black Hawk, individuals who purchased land from Black Hawk's sale of 1% Interests in the Thomas mining claims, and individuals who acted as agents of Black Hawk. This last category includes claims against Kathryn Eccker, individually and in her official capacity as Mayor of Black Hawk, James Maloney, individually and in his official capacity as City Attorney for Black Hawk, and Lynette Hailey, individually and in her official capacity as City Manager for Black Hawk, alleging a conspiracy to restrain trade in violation of 15 U.S.C. § 1 relating to the land transaction allegedly aimed at blocking construction of the Southern Access Road. Significantly, Plaintiffs did not bring any federal antitrust claims against

spiracy to interfere with the construction of the Southern Access Road. (*Id.* ¶¶ 60–63.) Specifically, it is alleged that Black Hawk, per the direction of its officials, purchased certain land, referred to as the Emeson land, to prevent Central City from acquiring that land to use in building the road. (*Id.* ¶¶ 64–68.) Central City filed condemnation proceedings against the Emeson land, and litigation was commenced. (*Id.* ¶¶ 69–70.) Central City and Black Hawk then reached a settlement, referred to as the Emeson settlement, wherein they allegedly agreed to cooperate on the Southern Access Road and Black Hawk's Water Project. (*Id.* ¶ 71.)[5]

Plaintiffs also allege that Black Hawk defeated Central City's continued attempts to build the Southern Access Road. They allege in that regard that Black Hawk defeated an annexation effort of other land that Central City planned to use to build the Southern Access Road, referred to as the Proland land, by buying certain mining claims located within the area of the pro-

posed annexation (referred to as "the Thomas mining claims") and selling 1% interests in the Thomas mining claims to numerous people. (*Id.* ¶¶ 73–89, 95–94.)[6] Plaintiffs claim Black Hawk did this in order to create more landowners in an effort to prevent Central City from acquiring the required signatures of 50% of the landowners in the proposed annex area, once again blocking Central City's attempt to build a Southern Access Road. (SRTAC ¶ 89.)

Additionally, Plaintiffs allege that a second parcel of land, owned by H. Thomas Winn, was also necessary to construct the Southern Access Road, and that Winn petitioned Central City to include his land in the proposed Proland Annexation. (SRTAC ¶¶ 95, 96.)[7] Simultaneously, Plaintiffs allege, while Winn was negotiating with Black Hawk officials to open the Isle of Capri Casino in Black Hawk, these same officials indicated that the grant of a certificate of occupancy would be conditioned upon Winn's with-

---

the City of Black Hawk. Moreover, subsequent to the filing of the Second Revised Third Amended Complaint, Plaintiffs notified the Court at the Hearing on Defendants' Motion to Dismiss, held August 28, 2003, that they withdrew their Breach of Contract Claims (ninth and tenth claims) against the City of Black Hawk involving the Emeson and IGA agreements, thereby completely removing Black Hawk as a party to this action. (Tr. at 9.) Additionally, as noted below, Plaintiffs' claims against David D. Spellman, Haller G. Midcap, and Tom Kerr, individually, and in their official capacity as members of the Black Hawk Board of Aldermen, were either dismissed with prejudice or withdrawn with prejudice.

5. Plaintiffs originally alleged that "Black Hawk has breached and continues to breach its contractual obligations under the Emeson agreement." Claims 9 and 10 for Breach of Contract of the Emeson Settlement Agreement and the IGA, respectively, were renumbered claims 7 and 8 in the Second Revised

Third Amended Complaint after this Court dismissed the original claims 7 and 8 involving RICO and COCCA, as discussed *infra*.

6. Plaintiffs' Second Revised Third Amended Complaint contains two errors in the numbering of paragraphs found on pages 18–20 that affect the numbering from there on. The final paragraph on page 17 is listed as ¶ 90 while the first paragraph on page 18 is listed as ¶ 93 thereby omitting ¶¶ 91, 92. Additionally, the final paragraph on page 19 is listed as ¶ 96, with the first paragraph on page 20 listed as ¶ 91 thereby numbering ¶¶ 91 and 92 for the first time and repeating ¶¶ 93, 94, 95, 96 for the second time. This citation is meant to refer to ¶¶ 95 and 96 on page 19 and ¶¶ 91–94 on page 20. All subsequent citations refer to the paragraph numbers as listed in the Second Amended Third Revised Complaint, unless it is noted that the citation falls on page 18, 19, 20, 21.

7. ¶¶ 95 and 96 as listed on page 21 of the Second Amended Third Revised Complaint.

drawal of his petition to be included in the Proland Annexation. (*Id.* ¶¶ 97–102.) Winn subsequently withdrew his land, and this withdrawal, coupled with the defeat of the annexation proposal by voters allegedly forced Proland to withdraw its annexation proposal and its offer to fund, in part, the construction of the Southern Access Road. (*Id.* ¶¶ 102, 103.)

The Second Revised Third Amended Complaint asserts the following claims: (1) violation of 15 U.S.C. § 1—Conspiracy to Restrain Trade (Against everyone but Black Hawk); (2) violation of 15 U.S.C. § 2—Conspiracy to Monopolize (against certain Defendants); (3) violation of 15 U.S.C. § 2—Attempted Monopolization (against certain Defendants); (4) violation of Colo.Rev.Stat. § 6–4–104 -Conspiracy to Restrain Trade (against everyone but Black Hawk); (5) violation of Colo.Rev. Stat. § 6–4–105 -Conspiracy to Monopolize (against certain Defendants); (6) violation of Colo.Rev.Stat. § 6–4–105—Attempted Monopolization (against certain Defendants); (7) (violation of 18 U.S.C. § 1962(c)—RICO") (against everyone but Black Hawk); (8) violation of Colo.Rev. Stat. § 18–17–104(3)—COCCA (against everyone but Black Hawk); (9) breach of contract—the Emeson Settlement Agreement (against Black Hawk); (10) breach of contract—the IGA (against Black Hawk); (11) intentional interference with a prospective economic advantage (against everyone but Black Hawk); (12) civil conspiracy (against everyone but Black Hawk); (13) intentional interference with contractual relations (against everyone but Black Hawk); and (14) exemplary damages (against everyone but Black Hawk).

Since the Second Revised Third Amended Complaint was filed, however, Plaintiffs' eleventh claim for intentional interference with prospective business advantage; twelfth claim for civil conspiracy; and thirteenth claim for intentional interference with contractual relations have been dismissed with prejudice as to all Defendants.[8] In addition, Plaintiffs withdrew their second claim for conspiracy to monopolize in violation of 15 U.S.C. § 2; their third claim for attempted monopolization in violation of 15 U.S.C. § 2; their fifth claim for conspiracy to monopolize in violation of Colo. Rev. Stat. § 6–4–105;. and their sixth claim of attempted monopolization in violation of Colo. Rev. Stat. § 6–4–105, as to Defendants Prospector 141, LLC ("Prospector 141"), Black Hawk Development North, LLC ("BHDN"), Tom Kerr ("Kerr"), Haller G. Midcap ("Midcap"), and David D. Spellman ("Spellman") only. Plaintiffs have also withdrawn with prejudice—against Spellman, Kerr, Midcap, Kathryn Eccker ("Eccker"), James S. Maloney ("Maloney"), and Lynnette Hailey ("Hailey") only—their fourth claim alleging conspiracy to restrain trade in violation of Colo. Rev. Stat. § 6–4–104; their fifth claim alleging conspiracy to monopolize in violation of Colo. Rev. Stat. § 6–4–105; their sixth claim alleging attempted monopolization in violation of Colo. Rev. Stat. § 6–4–105; and their eighth claim alleging a violation of the Colorado Organized Crime Control Act ("COCCA"), Colo. Rev. Stat. § 18–17–104(3)[9]

---

8. These claims were withdrawn with prejudice as to David D. Spellman, Haller G. Midcap, Tom Kerr, Kathryn Eccker, James S. Maloney, and Lynnette Hailey. As to the remaining Defendants, Plaintiffs simply stated that they were withdrawing these claims, without referencing whether the withdrawal was with or without prejudice. I will assume that these claims have been withdrawn with prejudice.

9. The fifth and sixth claims were already withdrawn as to certain Defendants; however, this sentence discusses the fact that the withdrawal is with prejudice.

By Order dated October 31, 2002, I de-nied Black Hawk's Motion to Dismiss (Improper Venue) filed December 20, 2001. This motion sought to dismiss only the ninth and tenth claims for lack of subject matter jurisdiction and improper venue. I also granted the Motion of Defendants Spellman, Midcap and Kerr for Partial Summary Judgment (No Individual Liability for Acts of Colorado Limited Liability Company), filed December 21, 2001, as to the remaining claims against these Defendants (the first claim, federal conspiracy to restrain trade, and the seventh claim, RICO.) [10]

By Order dated March 26, 2003, I dismissed with prejudice the eleventh, twelfth, and thirteenth claims for relief relating to the intentional interference with prospective economic advantage, civil conspiracy, and the intentional interference / inducing breach of contract claims, respectively. I additionally dismissed with prejudice the seventh and eighth claims for relief involving RICO and COCCA. Moreover, Plaintiffs withdrew with prejudice their claims against Defendants David Spellman, Haller G. Midcap, and Tom Kerr with regard to the second, third, fourth, fifth, sixth and fourteenth claims as well as Plaintiffs' claims against Defendants Kathryn Eccker, James Maloney, and Lynett Hailey with regard to the fourth, fifth, sixth and fourteenth claims.

By Order dated April 23, 2003, I granted plaintiff Central City's stipulated motion to dismiss all claims that it had brought against all of the Defendants in this action, thereby dismissing Central City as a party to this action.

By Order dated June 13, 2003, I granted Plaintiffs' motion for leave to amend the Second Amended Complaint and simultaneously denied without prejudice Defendants' Joint Motion to Dismiss Antitrust Claims. I also denied Plaintiffs' Motion for Partial Amendment per FED. R. CIV. P. 59(e) via a Clarification of Order dated March 26, 2003.

Subsequent to the filing of the Plaintiffs' Second Revised Third Amended Complaint, Plaintiffs also withdrew their first claim alleging a conspiracy to restrain trade in violation of 15 U.S.C. § 1 as it related to the construction of allegedly impermissibly large casinos and to the construction and maintenance of the Highways that access Black Hawk and Central City. Additionally, Plaintiffs withdrew their fourteenth claim for exemplary damages.[11]

Thus, the remaining federal claims before this Court include (a) the first claim of conspiracy to restrain trade in violation of 15 U.S.C. § 1 against all Defendants except Black Hawk, David Spellman, Haller G. Midcap, and Tom Kerr;[12] (b) the second claim of a conspiracy to monopolize in violation of 15 U.S.C. § 2 against Defendants Black Hawk Casino, Canyon Casino, Mardi Gras Casino, Black Hawk Gaming, Jackpot Springs, and Woodmont; and (c) Plaintiffs' third claim of attempted monopolization in violation of 15 U.S.C. § 2 against Defendants Black Hawk Casino, Canyon Casino, Mardi Gras Casino, Black

---

**10.** All other claims against Speller, Midcap and Kerr had previously been withdrawn or dismissed.

**11.** Although still included in the Second Revised Third Amended Complaint, Plaintiffs notified the Court of these withdrawals in the form of Plaintiffs' submission of a "Chart of Claims Outstanding," as referenced in the transcript of the Hearing on Defendants' Motion to Dismiss held on August 28, 2003. (Tr. at 10, II. 15–17.)

**12.** The Section 1 claim only relates to the land transactions surrounding the proposed Proland Annexation.

Hawk Gaming, Jackpot Springs, and Woodmont.[13]

## II. Analysis: Motion to Dismiss for Failure to State a Claim (Fed. R.Civ.P. 12(b)(6))

The essence of the remaining conduct challenged by Plaintiffs centers on the proposed construction of the Southern Access Road into Central City. The existing roads require potential customers of Central City casinos to travel first through Black Hawk, located approximately one mile east of Central City, which itself offers numerous opportunities to gamble.[14] Due to continual construction and roadblocks, not at issue here, as well as a fear that potential customers would stop in the City of Black Hawk to gamble and not continue on to Central City, Central City decided to build a second access road into Central City from the south. In order to accomplish this, Central City sought to annex land in order to form a contiguous tract of land to build the Southern Access Road. In response, Black Hawk sought to oppose annexation of the land by purchasing several tracts of land and selling the mineral rights to several of the Defendants with a pledge to preserve open space, in an apparent effort to increase the number of voters eligible to consider the annexation question and to thereby defeat the proposed annexation by Central City. It is important to note that Black Hawk's actions are not directly challenged in this action.

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court " 'must accept all the well-pleaded allegations as true and must construe them in the light most favorable to the plaintiff.' " *David v. City and County of Denver,* 101 F.3d 1344, 1352 (10th Cir.1996), *cert. denied,* 522 U.S. 858, 118 S.Ct. 157, 139 L.Ed.2d 102 (1997). "A complaint may be dismissed pursuant to [Rule] 12(b)(6) only 'if the plaintiff can prove no set of facts to support a claim for relief.' " *Id.* (quoting *Jojola v. Chavez,* 55 F.3d 488, 490 (10th Cir.1995)).

### A. Subject–Matter Jurisdiction

■ The initial inquiry in this case is whether this Court has the requisite jurisdiction to entertain Plaintiffs' claims of a violation of the Sherman Act. In order "to satisfy interstate commerce jurisdiction under the Sherman Act the challenged activity must occur in the flow of interstate commerce, or, though occurring on a purely local level, substantially affect interstate commerce." *Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715, 720 (10th Cir.1980) (en banc) (emphasis in original). As the allegations only involve activity on the local level, the relevant inquiry is the "effect on commerce" test. In addressing this requirement, the Supreme Court has stated that the relevant question is whether "the defendants' activity . . ., if it is local in nature, . . . has an effect on some other appreciable activity demonstrably in interstate commerce." *McLain v. Real Estate Bd., Inc.,* 444 U.S. 232, 242, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). Moreover, "[t]o establish jurisdiction a plaintiff

---

**13.** There are also three remaining state law claims, the 4th, 5th, and 6th claims, against several Defendants for conspiracy to restrain trade, conspiracy to monopolize, and attempted monopolization. Due to the disposition of this case, the Court does not address the validity of these state law claims.

**14.** According to the Second Revised Third Amended Complaint, as of August 2001, of the 14, 231 slot machines registered in Colorado, 1,653 were in Central City, roughly 11.6 %, while 8,368, or 58.8 % of registered slot machines were in Black Hawk. (SRTAC ¶ 142.) Thus in August 2001, Black Hawk had slightly over five times the number of slot machines in operation in Central City.

must allege the critical relationship in the pleadings." *Id.*

■■■ The Tenth Circuit has interpreted *McLain* to require that the plaintiff show "the requisite nexus 'between the defendant's challenged activities and interstate commerce.'" *Anesthesia Advantage, Inc. v. Metz Group,* 912 F.2d 397, 401 (1990). Accordingly, in order to establish jurisdiction, Plaintiffs must "(1) identify a 'relevant' aspect of interstate commerce, and (2) specify its relationship to the defendant's activities alleged to be 'infected' with illegality." *Crane,* 637 F.2d at 723. Additionally, Plaintiffs must show that Defendants' conduct has a "not insubstantial effect on the interstate commerce involved." *McLain,* 444 U.S. at 246, 100 S.Ct. 502 (citing *Hospital Bldg. Co. v. Rex Hosp. Trs.,* 425 U.S. 738, 745, 96 S.Ct. 1848, 1852, 48 L.Ed.2d 338 (1976)). However, "an elaborate analysis of interstate impact is not necessary at the jurisdictional stage, only an allegation showing a logical connection as a matter of practical economics between the unlawful conduct and interstate commerce." *Crane,* 637 F.2d at 723.

■■■ As an initial matter, Plaintiffs have adequately identified a "relevant" aspect of interstate commerce. Similar to the plaintiffs in *Anesthesia Advantage,* 912 F.2d at 402–03, Plaintiffs have alleged that their businesses serve a substantial number of out-of-state visitors and that they derive a not insubstantial portion of their revenue from out-of-state tourists. (*Id.* ¶ 148.) Additionally, Plaintiffs also allege that they purchase equipment, such as slot machines, from out-of-state providers. (*Id.* ¶ 144.) These allegations sufficiently identify a "relevant" aspect of interstate commerce.

Plaintiffs likewise meet the second requirement by showing that Defendants' challenged conduct has a not insubstantial

effect on the identified relevant aspect of interstate commerce. Here, this Court is mindful that "the test for the adequacy of the requisite nexus between interstate commerce and the defendant's challenged activities is a 'pragmatic' one which turns on the particular facts of the particular case." *Anesthesia Advantage,* 912 F.2d at 402. Moreover, Plaintiffs "need not establish that the flow of interstate commerce is actually *diminished;* it is sufficient to show that such commerce is affected in more than a *de minimis* way." *Id.* at 401 (citing *McLain,* 444 U.S. at 243, 100 S.Ct. at 509–10) (emphasis in original). Here, Plaintiffs allege that Defendants collectively conspired to block the construction of the Southern Access Road and that, since most travelers labor under the misapprehension that Black Hawk and Central City are the same town, the result is that fewer out-of-state tourists continue on to Central City. They contend that not only would the construction of the Southern Access Road allow out-of-state tourists to drive directly to Central City without first passing through Black Hawk, it would also provide a more direct route from a major transportation route, Interstate 70. (SRTAC ¶¶ 58, 59.) This, according to Plaintiffs, would allow more convenient access to Central City for both out-of-state tourists and suppliers of casino equipment who deliver their products. Although Plaintiffs do not offer an elaborate economic analysis of the impact of the defeated Southern Access Road, nor provide evidence that interstate commerce is actually diminished, they have shown that interstate commerce "is affected in more than a *de minimis* way." Accordingly, Plaintiffs have alleged sufficient facts to support jurisdiction in this case.

### B. Anticompetitive Conduct, *Noerr–Pennington* Immunity

The fact that Plaintiffs have alleged sufficient facts to establish jurisdiction does

not establish that they have alleged sufficient facts to demonstrate a violation of the antitrust laws. Showing an effect on interstate commerce is a far cry from demonstrating that Defendants' conduct constituted an impermissible restraint of competition under Section 1 of the Sherman Act, or a conspiracy to monopolize or attempted monopolization under Section 2 of the Sherman Act.

In this case, the challenged conduct consisted of several Defendants participating in various ways in Black Hawk's efforts to block Central City's annexation of the land necessary to construct the Southern Access Road. For the purpose of this analysis, it is helpful to divide Defendants into three classes: (1) the private Defendant casinos and other companies who lobbied Black Hawk officials to sell the mineral interests to private purchasers ("group one"); (2) the Black Hawk officials involved, namely Defendants Eccker, Maloney, and Hailey ("group two"); and (3) Defendant private purchasers, namely Defendants Susan Barnes, Medill Barnes, Lary Brown, Phyllis Brown, and Herbert Bowles ("group three"). Of critical importance in this case is the fact that the actions of the Black Hawk itself are unchallenged.[15]

As an initial matter, Plaintiffs' allegations of impermissible conduct on the part of the private Defendants (group one and three), are little more than nebulous claims of a conspiracy between the agents of Black Hawk and these Defendants. However, Plaintiffs provide no details in their allegations as to how this conspiracy operated. Construing the allegations in the Second Revised Third Amended Complaint in the light most favorable to Plaintiffs, the

most that the allegations support is a claim that several of the Defendants may have lobbied Black Hawk and its officers to block the construction of the Southern Access Road in order to gain a competitive advantage over Plaintiffs, and that the remaining Defendants either intentionally or unintentionally participated in that effort.

However, it is precisely this type of conduct that the *Noerr–Pennington* doctrine immunizes. "The *Noerr–Pennington* doctrine is based upon the protections of the First Amendment and exempts from antitrust liability any legitimate use of the political process by private individuals, even if their intent is to eliminate competition." *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1503 (10th Cir.1997) (citing *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)). Immunity under the *Noerr–Pennington* doctrine is not absolute. For example, "bribery, or misuse or corruption of governmental processes are outside the protection of the *Noerr–Pennington* doctrine." *Oberndorf v. City and County of Denver*, 900 F.2d 1434, 1441 (10th Cir.1990) (citing *Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639, 650 (10th Cir.1987)). *See also id.* at 1440 ("*Noerr–Pennington* does not provide immunity where legitimate lobbying efforts are accompanied by illegal or fraudulent actions."). However, Plaintiffs have not alleged any facts supporting a charge of bribery or corruption on the part of any of the Defendants. All that the Plaintiffs have alleged is a "conspiracy" between the private Defendants (groups one and three) and agents of Black Hawk (group two). Yet, "*Noerr–Pennington* cannot be circumvented by merely alleging

---

15. No antitrust claim was ever filed against the City of Black Hawk, and Plaintiffs' ninth and tenth claims alleging a breach of contract with regard to the Emeson Settlement Agreement and the IGA have been withdrawn. *See* Chart of Claims Outstanding, tendered to the Court at the August 28, 2003 hearing.

that a government official was involved in the alleged conspiracy." *Oberndorf,* 900 F.2d at 1440. So long as the private Defendants' actions were legal, the fact that Plaintiffs merely allege that Black Hawk may have exceeded its municipal authority does not render the private Defendants' conduct impermissible under the antitrust laws.

The closest question of anticompetitive conduct involves the Mayor of Black Hawk, Kathryn Eccker; the City Attorney for Black Hawk, James Maloney; and the City Manager for Black Hawk, Lynette Hailey, all of whom acted as agents of Black Hawk in its alleged attempt to block the Proland annexation. Plaintiffs adequately allege facts in the form of transcripts of Black Hawk City Council meeting, attached to the Second Revised Third Amended Complaint as Exhibits N and O, that are sufficient to support an inference that these Defendants were, in fact, involved with Black Hawk's efforts to block the Proland annexation. Yet Plaintiffs fail to present specific anticompetitive intent or legal wrongdoing on the part the City of Black Hawk or, by extension, its agents. The only intent supportable from the Second Revised Third Amended Complaint and attached exhibits on the part of Black Hawk and its officials is an intent to block the Proland Annexation, not an intent to restrict competition. Moreover, Plaintiffs can point to no law that Black Hawk violated by assigning the 1% interests in the Thomas mining claims or by repurchasing

the assignments after the Proland annexation was blocked. Plaintiffs do not allege that Defendants' conduct was in violation of the Colorado Municipal Annexation Act, Colo. Rev. Stat. § 31–12–101, *et seq.* or the relevant Article III, § 30 of the Colorado Constitution. As Plaintiffs themselves point out, a Grand Jury investigated the activities in question, but did not issue an indictment. (SRTAC ¶ 130, Ex. E.) [16]

With regard to the alleged influence on H. Thomas Winn by officials of Black Hawk (*Id.* ¶¶ 95–103),[17] Plaintiffs again fail to plead sufficient facts to support an antitrust claim. Construed in the light most favorable to Plaintiffs, Exhibits J and K support an inference that Winn was pressured into withdrawing from the Proland Annexation project in order to obtain a Certificate of Occupancy necessary to operate a casino in Black Hawk.[16] However, thus construed, the exhibits do not contain sufficient facts to support an inference that it was these particular Defendants (Eccker, Maloney, and Hailey), as opposed to the City of Black Hawk itself or another official of Black Hawk, who exerted the pressure upon Winn. Indeed, Plaintiffs fail to allege that these Defendants had any knowledge of or control over Winn's pending Certificate of Occupancy. Moreover, even if Defendants could be shown to have had such knowledge, there is no indication in either the Second Revised Third Amended Complaint or Affidavits why

---

**16.** Exhibit F attached to the Second Amended Third Revised Complaint is a copy of an article from the *Denver Post* from Tuesday, February 18, 2003, entitled "Black Hawk grand jury report ordered released" by Howard Pankratz. As the article points out, the Colorado Court of Appeals ordered the release of the Grand Jury report based on a finding that the publication of the report was in the public interest. However, the fact that the release of the report is in the public interest is not the same as a finding of misconduct on the part

of Black Hawk. Nor are the newspaper's allegations about the content of the report meaningful in light of the fact that the Grand Jury did not issue an indictment. Plaintiffs did attach a copy of the Grand Jury report as Exhibit G, but as it is under seal its contents will not be referenced to in this opinion.

**17.** ¶ 95 refers to ¶ 95 on page 21 of the Complaint.

such an agreement between the parties is impermissible.

Given the lack of concrete allegations of wrongdoing on the part of any of the Defendants, Plaintiffs have failed to show the requisite anticompetitive conduct necessary to bring a claim under the Sherman Act.

### C. Standing

Even if I were to determine that Plaintiffs' Second Revised Third Amended Complaint contains specific allegations of impermissible anticompetitive conduct involving Defendants, Plaintiffs fail to establish that Defendants' conduct caused them an antitrust injury. Thus, Plaintiffs lack standing.

■ In order to maintain standing to bring a private antitrust suit, Plaintiffs must show "(1) an antitrust injury; and (2) a direct causal connection between that injury and a defendant's violation of the antitrust laws." *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1254 (10th Cir.2003) (quoting *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 882 (10th Cir.1997)). Here Plaintiffs fail on both requirements.

■ As the Tenth Circuit has made clear, "[t]o meet the first prong[, plaintiffs] must allege a business or property injury, an antitrust injury, as defined by the Sherman Act. An antitrust injury is defined as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 652 (10th Cir.1992) *overruled on other grounds, Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137 (10th Cir.1997). It is important to remember that "[t]he antitrust laws ... were enacted for 'the protection of competition not competitors.'" *Brunswick Corp.*

*v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). Thus, an antitrust injury must be attributable to "a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Therefore, when individual companies are driven out of business simply because of legitimate competitive forces, there is no antitrust violation. Rather, antitrust laws are concerned with the corruption of the competitive process.

■ Here, Plaintiffs have failed to allege any injury to the competitive process or claim any injury to consumers. Their Second Revised Third Amended Complaint simply alleges injuries to themselves. (SRTAC ¶¶ 133–141, 145.) Plaintiffs note that Black Hawk's adjusted gross proceeds from gaming have risen from $217 million in 1996 to $510 million in 2002, while Central City's adjusted gross proceeds from gaming have declined from $82 million in 1996 to $56 million in 2002. (*Id.* ¶¶ 132, 133.) Moreover, Plaintiffs note that several casinos, including GF Gaming, Annie Oakley, Baby Doe, Sheftel, Proland, and Lorenz, have respectively suffered declining revenues (*Id.* ¶¶ 134, 135), have been "negatively impacted" (*Id.* ¶ 136), have gone out of business several times (*Id.* ¶ 137), have been unable to develop its property (*Id.* ¶ 138), or have suffered losses resulting from the closure of a restaurant and casino. (*Id.* ¶ 139.) Yet Plaintiffs fail to make any cognizable claim that supports injury to the competitive process as opposed to individual competitors.

The closest Plaintiffs come to alleging an injury to *competition* is a vague statement that "Defendants' anticompetitive behavior has ... negatively affected both Colorado

and out-of-state customers frequenting the limited gaming market in Gilpin County." (*Id.* ¶ 149.) This is not enough. Even bolstered by Plaintiffs' allegations that the Southern Access Road would have provided easier access to Central City, there is no indication, absent additional allegations of misconduct not asserted here, that consumers are worse off for having to drive through Black Hawk as opposed to driving directly to Central City. Given the distance that potential customers must drive to reach the Gilpin County casinos in the first place, the additional mile required to reach Central City by using the current road system is not significant enough to constitute an injury to consumers.

Plaintiffs make their allegation only slightly more concrete by alleging in general terms that "Defendants' conduct has also negatively impacted consumer choice in the limited gaming market." (*Id.* ¶ 148.) However, allowing Plaintiffs to establish standing by merely alleging that consumers are harmed by Defendants' conduct, without requiring that they assert more specific facts, would make the standing inquiry meaningless. Moreover, although phrased in terms of competitive injury, Plaintiffs' statement that consumer choice is limited amounts to little more than a claim that specific companies have been driven out of business and that, therefore, consumers have lost an option when choosing where to gamble. However, this is true in all situations where a particular company is driven out of business, and finding standing without a more rigorous inquiry would give every unsuccessful company antitrust standing under the theory that consumers have been deprived of an option. The standing inquiry was designed to require more.

■ Even if Plaintiffs' allegations could be construed to support an inference of injury to the competitive process, as opposed to injury to competitors, there is no indication that the conduct challenged in this case caused that injury. In order to "establish the second prong of antitrust standing, [plaintiffs] must show the antitrust injury resulted directly from [defendants'] violation of antitrust law." *City of Chanute*, 955 F.2d at 652 (citation omitted). The following factors are considered when determining antitrust standing:

(1) the causal connection between the alleged antitrust violation and the harm;

(2) improper motive or intent of defendants;

(3) whether the claimed injury is one sought to be redressed by antitrust damages;

(4) the directness between the injury and the market restraint resulting from the alleged violation;

(5) the speculative nature of the damages claimed; and

(6) the risk of duplicative recoveries or complex damage apportionment.

*City of Chanute*, 955 F.2d at 652 n. 14 (citation omitted). It is important to remember that these "enumerated factors are not 'black-letter rules,' but merely 'give more specificity to the inquiry mandated by the two part test.'" *Sports Racing*, 131 F.3d at 882 (quoting *Sharp v. United Airlines, Inc.*, 967 F.2d 404, 406, 407 n. 2 (10th Cir.1992)).

Applying these factors to the case at hand, it is significant that the immediate cause of the injury to Plaintiffs is not the denial of the annexation necessary for construction of the Southern Access Road. Rather, as Plaintiffs concede, their alleged injury is caused by the existing road system itself (SRTAC ¶ 54—55), as well as the continual construction and roadblocks on that road (*Id.* ¶ 58), neither of which is challenged in the present case. At worst, Defendants' conduct prevented Plaintiffs

from solving the pre-existing problem that was causing injury to Plaintiffs. (*Id.* ¶ 58) ("In order to remedy the unlawful advantage enjoyed by the casinos in Black Hawk, in 1998 Central City initiated discussions and plans to construct ... the 'Southern Access Road.'")

Second, even construing all of the allegations in Plaintiffs' favor, the most they support is the conclusion that Black Hawk and the remaining Defendants opposed the annexation of the land necessary to build the Southern Access Road, not necessarily the construction of the Southern Access Road itself. Thus, the Open Space Agreement is alleged only to address annexation and would not obstruct the condemnation of land. (SRTAC ¶ 126.) As Plaintiffs concede, Central City still has the available option of condemning the land necessary to build the Southern Access Road.[18] Even if the motivation on the part of the private Defendant casinos was aimed at maintaining a competitive advantage, so long as they acted within the bounds of permissible political lobbying, their intent is irrelevant under the *Noerr–Pennington* doctrine. *See Zimomra*, 111 F.3d at 1503 (citing *Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626).

Third, given the background and history of the dispute, as well as statements by Black Hawk officials and the terms of the Open Space Agreement, the underlying dispute seems to be more a disagreement between two municipalities regarding city limits and development than a dispute between private casinos vying to gain competitive advantages. Although municipal action can, in certain rare circumstances, give rise to antitrust liability, the antitrust laws were not designed to resolve land-use disputes between municipalities.

Fourth, in addition to the remote causal connection between the violation and the harm, the directness of injury is further limited by the fact that potential customers can still access Central City to gamble. There is no conduct at issue in this case that explains how or why consumers are forced to stop in Black Hawk to gamble as opposed to continuing for a mile to Central City to gamble. Even construing the facts in the light most favorable to the Plaintiffs, consumers still choose of their own volition to gamble in Black Hawk as opposed to Central City.

Fifth, even if obstruction of the construction of the Southern Access Road, rather than restricted access to Central City, were the immediate cause of Plaintiffs' declining revenues, Plaintiffs have failed to show that their general decline in revenues and the increase in Defendants' revenues have any link to the obstruction of the Southern Access Road. Standing alone, statistics showing a decline in Plaintiffs' revenues and an increase in Defendants' revenues do not indicate a causal relationship between Defendants' actions and the decrease in Plaintiffs' revenues.[19]

---

18. The Plaintiffs also still have available the course of action they chose to pursue with regard to the Emeson property. See n. 15, *supra*. As Plaintiffs concede, "in the face of the failed Proland annexation, ... Central City was required to pursue the alternative of selling approximately $45 million of municipal bonds to fund construction of the Southern Access Road." (SRTAC ¶ 126.)

19. Compounding the problem with Plaintiffs' statistics is the fact that the increase in Defen-

dants' revenue is not a one-to-one relationship with Defendants' decrease in revenue. Thus, Central City's revenue declined from $82 million in 1996 to $56 million in 2002, a decline of $26 million. Black Hawk, on the other hand, enjoyed an increase in revenue from $217 million in 1996 to $510 million in 2002. (SRTAC ¶¶ 132–133.) Even assuming that Black Hawk absorbed Central City's $26 million decline, Central City does not account for the remaining $191 million increase in Black Hawk's revenue. Plaintiffs have not provided

Finally, given the number of Plaintiffs (some of whom represent more than one interested party), the numerous Defendants (who represent everyone from officials of Black Hawk, to private casinos, to private purchasers of land), and the speculative nature of the damages involved, the risk of duplicative recovery is immense and the damage apportionment overly complex.[20]

In light of the above considerations, Plaintiffs have failed adequately to allege sufficient facts to support an inference that Defendants' conduct caused the injury to Plaintiffs. Coupled with Plaintiffs' failure to allege an antitrust injury, Plaintiffs' allegations construed in the light most favorable to them fail to set forth sufficient facts to satisfy the standing requirements and, therefore, Plaintiffs lack standing to bring the antitrust claims.

### III. *Supplemental State Claims*

All claims that remain arise under state law. In the absence of jurisdiction to hear Plaintiffs' antitrust claims, this Court must also dismiss Plaintiffs' supplemental state law claims. 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction). *See also United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir.2002) ("[W]hile we have suggested that it is appropriate ... for a district court to retain supplemented state claims after dismissing all federal questions when the parties have already expended a great deal of time and energy on the state law claims, ... we have held that, absent such a showing, a district court should normally dismiss supplemental state law claims after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial.") I decline to exercise supplemental jurisdiction over Plaintiffs' state law claims, and dismiss the state law claims without prejudice.

### IV. *Conclusion*

Based on the foregoing, it is

ORDERED Defendants' Joint Motion to Dismiss Antitrust Claims, filed July 3, 2003, is **GRANTED**. It is

FURTHER ORDERED that, pursuant to FED. R. CIV. P. 12(b)(6), Plaintiffs'

---

any mechanism for determining the growth rate that would have occurred absent Defendants' allegedly anticompetitive conduct.

Nor does using the 2001 benchmark for slot machines in operation provided by Plaintiffs improve their statistical claim. The revenues Plaintiffs provide for 2001 ($60 million compared to $453 million) were not proportional relative to the number slot machines in operation. *See* n.14, *supra*. In 2001, Black Hawk had roughly five times the number of machines of Central City and roughly 7.55 times the revenue. Problematically, Central City provides no baseline with which to compare this isolated year in order to enable the Court to draw an inference that revenues were once proportional to the relative number of slot machines in operation.

As this discussion highlights, even construing Plaintiffs' summary statistical statements in the light most favorable to them, Plaintiffs'

allegations provide no way to explain why the disparity in revenues occurred and subsequently increased. Thus, this form of statistics, standing alone, is insufficient to show a cause between Defendants' conduct and Plaintiffs' decreased revenue. These points only highlight the myriad of potential causes for increases and decreases in revenue, many of which are the product of legitimate and efficient competition among market participant.

20. As note 19, *supra,* indicates, Plaintiffs' reference to Central City's decline in revenues compared with Black Hawk's as being reflective of "the scale of damages sustained by Plaintiffs," (SRTAC ¶ 133), is incredibly unqualified and only compounds the difficulty of fixing the amount of damages caused by the various Defendants and apportioning them among various Plaintiffs.

federal claims, which arise under 15 U.S.C. § § 1 and 2, are **DISMISSED WITH PREJUDICE.** As to the remaining state law claims, it is

FURTHER ORDERED that Plaintiffs' claims arising under COLO. REV. STAT. §§ 6–4–104 and 6–4–105, over which the Court elected not to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3), are **DISMISSED WITHOUT PREJUDICE.** It is

FURTHER ORDERED that Defendant Woodmont Development Company's Motion to Dismiss the Second Revised Third Amended Complaint filed June 26, 2003 is **DENIED AS MOOT.** It is

FURTHER ORDERED that Defendant Susan G. Barnes' Separate Motion to Dismiss Second Revised Third Amended Complaint filed July 3, 2003, is **DENIED AS MOOT.**